ADKINS ET AL., CONSTITUTING THE MINIMUM
WAGE BOARD OF THE DISTRICT OF COLUM-
BIA, *v.* CHILDREN'S HOSPITAL OF THE DIS-
TRICT OF COLUMBIA.

SAME *v.* LYONS.

APPEALS FROM THE COURT OF APPEALS OF THE DISTRICT OF
COLUMBIA.

Nos. 795, 796.   Argued March 14, 1923.—Decided April 9, 1923.

1. The Court of Appeals of the District of Columbia, while consti-
tuted of two of the three Justices of that court and one Justice of
the Supreme Court of the District, affirmed decrees of the latter
court dismissing bills; thereafter, at the same term, (the Supreme
Court Justice having been replaced by the third Justice of the
Court of Appeals) it granted rehearings and reversed the decrees,
and, thereafter, on second appeals, it affirmed decrees entered pur-
suant to the reversals. *Held* that objections to the jurisdiction to
grant the rehearings did not go to the jurisdiction over the second
appeals, and need not be decided here upon review of the decrees
of affirmance.   P. 543.

2. Every possible presumption stands in favor of an act of Congress
until overcome beyond rational doubt.   P. 544.

3. But when, in the exercise of the judicial authority to ascertain and
declare the law in a given case, it is clear and indubitable that an
act of Congress conflicts with the Constitution, it is the duty of
the Court so to declare, and to enforce the Constitution. *Id.*

4. This is not to exercise a power to review and nullify an act of
Congress, for no such power exists; it is simply a necessary con-
comitant of the power to hear and dispose of a case or controversy
properly before the court, to the determination of which must be
brought the test and measure of the law. *Id.*

5. That the right to contract about one's affairs is part of the liberty
of the individual protected by the Fifth Amendment, is settled by
repeated decisions of this Court.   P. 545.

6. Within this liberty are contracts of employment of labor. In
making these, generally speaking, the parties have equal right to
obtain from each other the best terms they can by private bar-
gaining. *Id.*

7. Legislative abridgment of this freedom can only be justified by the existence of exceptional circumstances. P. 546.

8. Review of former decisions concerning interferences with liberty of contract, by

(a) Statutes fixing the rates and charges of businesses affected by a public interest. P. 546

(b) Statutes relating to the performance of contracts for public work. P. 547.

(c) Statutes prescribing the character, methods and time for payment of wages. Id.

(d) Statutes fixing hours of labor. Id.

9. Legislation fixing hours or conditions of work may properly take into account the physical differences between men and women; but, in view of the equality of legal status, now established in this country, the doctrine that women of mature age require, or may be subjected to, restrictions upon their liberty of contract which could not lawfully be imposed on men in similar circumstances, must be rejected. P. 552.

10. The limited legislative authority to regulate hours of labor in special occupations, on the ground of health, affords no support to a wage-fixing law,—the two subjects are essentially different. P. 553.

11. The Minimum Wage Act of Sept. 19, 1918, c. 174, 40 Stat. 960, in assuming to authorize the fixing of minimum wage standards for adult women, in any occupation in the District of Columbia, such standards to be based wholly upon what a board and its advisers may find to be an adequate wage to meet the necessary cost of living for women workers in each particular calling and to maintain them in good health and protect their morals, is an unconstitutional interference with the liberty of contract. P. 554.

284 Fed. 613, affirmed.

APPEALS from decrees of the Court of Appeals of the District of Columbia, affirming two decrees, entered, on mandate from that court, by the Supreme Court of the District, permanently enjoining the appellants from enforcing orders fixing minimum wages under the District of Columbia Minimum Wage Act.

Mr. *Felix Frankfurter*, with whom Mr. *Francis H. Stephens* was on the brief, for appellants.

The presumption to be accorded an act of Congress—that it be respected unless transgression of the Constitution is shown " beyond a rational doubt "—amply sustains the District of Columbia Minimum Wage Law, particularly in view of the circumstances of its enactment. Congress, under Art. I, § 8, cl. 17, is possessed of the same power and charged with the same duty of legislating within the District as belongs to the States within their respective boundaries.    Congress, in dealing with a practical problem, followed the example of many States in passing the act in question.    Such legislation has uniformly been sustained by the courts.    *State* v. *Crow,* 130 Ark. 272; *Holcombe* v. *Creamer,* 231 Mass. 99; *Williams* v. *Evans,* 139 Minn. 32; *Miller Telephone Co.* v. *Minimum Wage Commission,* 145 Minn. 262; *Stettler* v. *O'Hara,* 69 Ore. 519; and *Simpson* v. *O'Hara,* 70 Ore. 261, affirmed by divided court in 243 U. S. 629; *Larson* v. *Rice,* 100 Wash. 642; *Spokane Hotel Co.* v. *Younger,* 113 Wash. 359; *Poye* v. *State,* 89 Tex. Crim. Rep. 182. Congress did not, however, rely upon a body of state laws sustained by the courts and vindicated by experience.    Senate and House Committees held hearings on the needs of this legislation, in view of the conditions prevailing in the District.    No one appeared to oppose the bill.    An organized body of employers endorsed the bill and urged its passage. The Committees unanimously recommended the legislation.    H. Rep. No. 571, 65th Cong., 2d sess.; S. Rep. No. 562, 65th Cong., 2d sess.    And the bill was passed without opposition in the House, and only twelve " nays " in the Senate.    Moreover, the judgment of Congress has now been vindicated by the results of over four years in the actual operation of the law, and ten years of extensive experience with such legislation in California, Massachusetts, Minnesota, Oregon, Washington and Wisconsin. Unfair depression in the wages of many women workers has been significantly reduced, without adversely affecting

industry or diminishing appreciably employment for employables. The legislation has also successfully weathered the severest strains of "hard times." It is urged with confidence that no such body of laws " attesting a widespread belief in the necessities of such legislation," *Prudential Insurance Co.* v. *Cheek,* 259 U. S. 530, supported by uniform judicial approval, subjected to so long, extensive, fair and favorable a test of actual experience, has ever been before this Court, to vindicate the reasonableness of the legislative intervention and to negative the claim that Congress was guilty of " a purely arbitrary or capricious exercise of that [legislative] power." *Truax* v. *Corrigan,* 257 U. S. 312, 329.

Congress aimed at " ends " that are " legitimate and within the scope of the Constitution." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421. Charged with the responsibility of safeguarding the welfare of the women and children of the District of Columbia, it found that alarming public evils had resulted, and threatened in increasing measure, from the widespread existence of a deficit between the essential needs for decent life and the actual earnings of large numbers of women workers of the District. In the judgment of Congress, based upon unchallenged facts, these conditions impaired the health of this generation of women and thereby threatened the coming generation through undernourishment, demoralizing shelter and insufficient medical care. In its immediate effects, also, financial burdens were imposed upon the District, involving excessive and unproductive taxation, for the support of charitable institutions engaged in impotent amelioration rather than prevention. Here, if ever, was presented a community problem of a most compelling kind, calling for legislation " greatly and immediately necessary to the public welfare." *Noble State Bank* v. *Haskell,* 219 U. S. 104, 111. The purpose of the act was to provide for the deficit between the cost of women's

labor, i. e., the means necessary to keep labor going—and any rate of women's pay below the minimum level for living, and thereby to eliminate all the evils attendant upon such deficit upon a large scale. There is no dispute that Congress was acting in good faith, after mature deliberation, in avowing the purposes which it did in the enactment of this law, to wit: " To protect the women and minors of the District from conditions detrimental to their health and morals, resulting from wages which are inadequate to maintain decent standards of life." Having regard to the concrete situation, the judgment of Congress that such legislation was necessary cannot in reason be stigmatized as unreasonable.

The means selected by Congress " are appropriate " and " plainly adapted " (*McCulloch* v. *Maryland, supra*) to accomplish the legitimate ends. The possible alternatives open to Congress in this situation were: (1), to submit to the evils as inevitable human misfortunes, subject only to alleviation through public and private charity; (2), provide a direct subsidy out of the public treasury to pay a wage equal to the necessary cost of living; (3), adopt the Massachusetts method, which seeks to compel for women workers a minimum wage through the pressure of public exposure of offending employers; or, (4), take the method it did take, which involved a prohibition of the use of women's labor for less than its cost except by special license from the Board.

There was cumulative testimony, both in the belief of those entitled to express an opinion and in the actual record of experience, that these evils are not inevitable human misfortune. Congress was entitled to disprove that lazy gospel of fatalism as other English-speaking countries equally jealous of safeguarding liberty and property, and many American States, had disproved it. From the point of view of effectiveness in accomplishing its purposes, the choice of Congress, among the three re-

medial methods, surely was not " arbitrary " or " unreasonable." It had the support of a great body of public opinion, (see *Jacobson* v. *Massachusetts,* 197 U. S. 11, 31, 34–35; *Muller* v. *Oregon,* 208 U. S. 412, 420; *McLean* v. *Arkansas,* 211 U. S. 539, 548–9; *Tanner* v. *Little,* 240 U. S. 369, 385–6), crystallized in the extensive and successful experience of English countries with such legislation, in the fact of such legislation in other States, in the successful working of such legislation. In other words, Congress rested upon the appeal " from judgment by speculation to judgment by experience." *Tanner* v. *Little,* 240 U. S. 369, 386.

Where a law has been long on the statute books, speculative claims of injustice must yield to the results of actual experience. Cf. *National Union Fire Ins. Co.* v. *Wanberg,* 260 U. S. 71.

No rights of plaintiffs secured under the Constitution prohibit the use of the means adopted by Congress in the Minimum Wage Law to accomplish legitimate public ends. It is for the plaintiff to show some explicit withdrawal of the legislative power as exercised in this case. The only alleged obstruction is the " due process " clause. And the only point for consideration is whether the deprivation of " liberty " or " property " which is involved is " without due process of law."

This Court has consistently recognized the futility of defining " due process." The " due process " clauses embody a standard of fair dealing to be applied to the myriad variety of facts that are involved in modern legislation. That is why this Court has refused to draw lines in advance. The impact of facts must establish the line in each case. The application of " due process " clauses is, in the last analysis, a process of judgment by this Court. In the application of the varying facts to the test of fair dealing the ultimate question in this Court is, does legislation, or its actual operation, " shock the sense of fairness

the Fourteenth Amendment was intended to satisfy in respect to state legislation "? *Chicago & N. W. Ry. Co.* v. *Nye Schneider Fowler Co.,* 260 U. S. 35. During the fifty years of extensive judicial unfolding, the central ideas that inhere in this constitutional safeguard have become manifest. A careful study of the long line of cases especially dealing with the " due process " clause, beginning with the *Slaughter-House Cases,* 16 Wall. 36, shows two dominant ideas conceived to be fundamental principles: (1) Freedom from arbitrary or wanton interference, and (2) protection against spoliation of property. "Arbitrary," " wanton " and " spoliation " are the words which are the motif of the decisions under the " due process " clauses. That is as close as we can get to it; it is close enough when dealing with the great questions of government. What it means is that the Fourteenth Amendment intended to leave the States the free play necessary for effective dealing with the constant shift of governmental problems, and not to hamper the States except where it would be obvious to disinterested men that the action was arbitrary and wanton, and therefore spoliative and unjustified. Of course exactly the same freedom of action, the same scope for legislation, belongs to Congress when dealing with the District.

It is not arbitrary, wanton or spoliative for Congress to require the consent of the Board before allowing a wage contract affecting women at below cost, but a valid exercise of the "'police power," because of the actual handicaps of women in industry. This was one of the principal grounds of the state courts in sustaining this legislation. This is legislation of the same nature as that revealed by a long line of cases upholding limitations placed upon freedom of contract with women in various ways. They rest upon a realization of the fact that the mass of women workers cannot secure terms of employment needful from the point of view of public welfare

without the weight of legislation being thrown into the scales. *Muller* v. *Oregon,* 208 U. S. 412; *Riley* v. *Massachusetts,* 232 U. S. 671; *Hawley* v. *Walker,* 232 U. S. 718; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *McLaughlin,* 236 U. S. 385.

It is not arbitrary, wanton or spoliative for Congress to require employers to pay the cost of women's labor. The employer, and the employer alone, receives the benefit of the woman's working energy, which cannot be produced or maintained by less than the reasonably ascertained minimum cost of her labor. Since he has her product he ought to pay for its cost, unless and until the employer, by special license, is given the right to use labor at less than its usual cost.

The action of Congress is not arbitrary, wanton, or spoliative; because the direct interest of the District in these particular wage contracts affecting women gave it a special justification for controlling them. A contract for labor below its cost must inevitably rely upon a subsidy from outside or result in human deterioration. To the extent of the subsidy or the deterioration the public is necessarily concerned. The employer has no constitutional right to such an indirect subsidy or to cause such deterioration. Nor has a woman any absolute " right " to give her energies to the employer if she cannot keep her side of the bargain without indirect subsidy or without incurring physical or moral impairment.

It is not arbitrary, wanton or spoliative to require the employer to obtain a license from the Board before he can buy a woman's labor at less than cost; because that is a reasonable means of preventing cut-throat and unfair competition between manufacturers. Congress legislated in the light of actual industrial conditions which denied the abstract equality of bargaining power among women. Congress found that women, in substantial numbers, were under a handicap because they were women. Therefore

by legislation it sought to fill the gaps caused by the ignorance or helplessness of women workers, and the ignorance or avarice of some employers. In this it merely followed a long line of legislation which has restricted the field of unregulated competition by prohibitions enforced through a great variety of remedies. The Constitution does not require that right standards should prevail solely through their inherent reasonableness or through enlightened self-interest.

It is not arbitrary, wanton or spoliative for Congress to require the consent of the Board before allowing a woman employee to sell labor below cost; because that is a reasonable means for preventing unfair competition between women employees. The underlying principle is the same as that which eliminates prison labor from competition against free labor. The essential purpose is to compel employers to pay the living cost to all their women employees whose product is worth it, and thereby correspondingly protect the efficient against ruinous competition.

It is not arbitrary, wanton or spoliative for Congress to require the consent of the Board before allowing wage contracts to women workers at below cost; because that is a reasonable exercise of power to foster the productivity of industry. This is a measure of conservation and preservation of the human resources of the State, which is of even more primary importance than the conservation of natural resources. And so its constitutionality follows *a fortiori* from the line of cases which support statutes passed for the preservation and effective utilization of natural resources. *Hudson Water Co.* v. *McCarter,* 209 U. S. 349; *Mt. Vernon Co.* v. *Alabama Power Co.,* 240 U. S. 30; *Pacific Live Stock Co.* v. *Oregon Water Board,* 241 U. S. 440; *Walls* v. *Midland Carbon Co.,* 254 U. S. 300.

The majority opinion of the District Court of Appeals erects its own notions of policy into constitutional prohi-

bitions. It assumes a specific constitutional prohibition against interference with the wage contracts. But there is no specific prohibition against dealing with a wage contract, as such. There is only the general guarantee of fair dealing,—the satisfaction of a " sense of fairness " of the " due process " clauses; and so we find that the wage contract has been interfered with frequently by legislation with the sanction of this Court—legislation which directly affected the money value of the wage contracts, which operated to the financial advantage of one side and was of alleged cost to the other. Payment in cash as against store orders, *Knoxville Iron. Co.* v. *Harbison*, 183 U. S. 13; *Dayton Coal Co.* v. *Barton*, 183 U. S. 24; *Keokce Co.* v. *Taylor*, 234 U. S. 227; payment on basis of coal mined before being screened, *McLean* v. *Arkansas*, 211 U. S. 539; *Rail and River Co.* v. *Yaple*, 236 U. S. 338; semi-monthly cash payments, *Erie R. R. Co.* v. *Williams*, 233 U. S. 685—all these requirements affected money terms, cash value, dollars and cents; all involved legislative interferences with wage contracts; all were sustained because each was found a not unreasonable means to safeguard a public interest. Each case was dealt with, not on any absolutist assumption of immunity of wage contracts from legislative interference, but quite the opposite; the concrete circumstances of each case were found to negative arbitrary restraint.

The great fact that this legislation applies solely to women has no relevance for the Court of Appeals. " If it [Congress] may regulate wages for women, it may by the exercise of the same power establish the wages to be paid men." This argument is founded upon the Nineteenth Amendment. But the political equality of woman is an irrelevant factor. The argument was long ago anticipated and answered, in classic language, by this Court. Men and women remain men and women forever. *Muller* v. *Oregon*, 208 U. S. 412, 422–23.

*Adair* v. *United States,* 208 U. S. 161, and *Coppage* v. *Kansas,* 236 U. S. 1, are wholly inapplicable. The considerations of public health, morals and the general welfare which are the basis and immediate aims of the Minimum Wage Law for women are not presented by the statutes involved in the earlier cases. The restricted scope of these cases, dealing with a purpose " to favor the employee at the expense of the employer and to build up the labor organizations " was carefully pointed out in a recent decision by the Justice who wrote for the court in the *Coppage Case. Prudential Insurance Co.* v. *Cheek,* 259 U. S. 530.

Neither in reason nor in experience does the Minimum Wage Law for women imply, as the court below indicated, power " to fix the prices of all commodities entering into the determination of an equitable wage." Nor is there any basis for the claim that " experience has demonstrated that a fixed minimum wage means in the last analysis a fixed wage."

On all these questions we appeal from " judgment by speculation " to " judgment by experience." *Tanner* v. *Little,* 240 U. S. 369, 386.

*Mr. Wade H. Ellis* and *Mr. Challen B. Ellis,* with whom *Mr. Joseph W. Folk* was on the brief, for appellees.

The Minimum Wage Law of the District of Columbia is unconstitutional because it is a price-fixing law, directly interfering with freedom of contract, which is a part of the liberty of the citizen guaranteed in the Fifth Amendment, and no exercise of the police power justifies the fixing of prices either of property or of services in a private business, not affected with a public interest, and as a permanent measure.

The protection of liberty and property guaranteed in the Fifth and Fourteenth Amendments includes freedom of contract, embracing contract for personal services.

*Coppage* v. *Kansas*, 236 U. S. 1, 14; *Truax* v. *Raich*, 239 U. S. 33; *Prudential Insurance Co.* v. *Cheek*, 259 U. S. 530. These principles apply to legislation by Congress for the District of Columbia. *Callan* v. *Wilson*, 127 U. S. 540, 550; *Wight* v. *Davidson*, 181 U. S. 371.

That a law fixing wages generally in private employment would be beyond legislative power is uniformly assumed or indicated in the decisions of this Court. Cooley, Const. Lim., 7th ed., p. 870; Labatt, Master and Servant, 2nd ed., § 846; *Frisbie* v. *United States*, 157 U. S. 160, 166; *Coppage* v. *Kansas*, 236 U. S. 1; *Bunting* v. *Oregon*, 243 U. S. 426. In decisions of this Court where wage laws or price-fixing laws have been sustained, such laws were sustained solely on the ground that they were to tide over a temporary emergency and in business affected with a public interest. *Wilson* v. *New*, 243 U. S. 332; *Ft. Smith & Western R. R. Co.* v. *Mills*, 253 U. S. 206; *Block* v. *Hirsh*, 256 U. S. 135; *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393.

There is a clear distinction between "hours-of-service," and similar laws directly promoting health or safety or preventing fraud and only indirectly affecting the cost of labor, on the one hand, and on the other hand "wage laws," directly fixing the price in the bargain between employer and employee, and only indirectly or remotely effecting some other purpose. The distinction is pointed out in *Coppage* v. *Kansas*, 236 U. S. 1; *Frisbie* v. *United States*, 157 U. S. 160, 166. (The mere freedom to contract secured in the constitutional guaranty cannot itself be said to be inimical to the public welfare and restricted under the guise of an exercise of the police power, for the police power cannot be used to amend the Constitution. *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393; *Truax* v. *Corrigan*, 257 U. S. 312. )

If a law fixing prices or wages is not a health law, because the mere freedom to determine the amount that

should be charged in the exchange of property or services for money cannot itself be dangerous to health, morals or safety, then manifestly it is not a health law for women any more than it would be for men, and it does not become valid by having it apply to women only. " Hours-of-service " laws are distinguishable in this respect. " Hours-of-service " laws, being clearly health laws within the police power, permit the exercise of legislative discretion to determine the extent to which they shall go and to take into account the differences in physical nature of the persons to whom they shall apply. They may be in a particular instance justified as to women, where they might not be as to men. *Muller* v. *Oregon,* 208 U. S. 412. But, being proper exercises of the police power, as health laws, they would also be valid when appropriately applied to men. *Bunting* v. *Oregon,* 243 U. S. 426. But the general rule that a person has the right to sell his labor upon such terms as he deems proper, is a fundamental rule applying to men and women alike. *Adair* v. *United States,* 208 U. S. 161, 174.

The contention that this Court must consider only the reasonableness of the law, so as to determine whether it is arbitrary, wanton or spoliative, and cannot consider the power of Congress to deal at all with the subject, is answered in the decisions. *Holden* v. *Hardy,* 169 U. S. 366; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429; *Coppage* v. *Kansas,* 236 U. S. 1; *Truax* v. *Raich,* 239 U. S. 33; *Mugler* v. *Kansas,* 123 U. S. 623; *Child Labor Tax Case,* 259 U. S. 20. If every law which expedience may suggest may be called a health law, or a public welfare law, and thus become an exercise of the police power, the constitutional limitations break down, and no action of the legislative body is in any way restricted by the positive guaranties of the fundamental law. *Truax* v. *Corrigan,* 257 U. S. 312; *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393; *Child Labor Tax Case, supra.*

The contention that the consequences of sustaining the power of the legislative body to fix wages for women cannot be considered, is wholly at variance with the decisions of this Court in numerous cases. In testing the constitutionality of any legislative act, we have the right to inquire, as this Court did, in *Adair* v. *United States,* 208 U. S. 161; *Coppage* v. *Kansas,* 236 U. S. 1; *Truax* v. *Raich,* 239 U. S. 33; *Truax* v. *Corrigan,* 257 U. S. 312; *Child Labor Tax Case,* 259 U. S. 20, to what distance and in what direction the departure from familiar standards may lead us, and what precedents may be established by sustaining the power claimed, which may be cited hereafter as authority for further legislation of wider scope or more extended character.

Requirement of a minimum wage, without corresponding requirement of amount or efficiency of service in return, is the taking of property without just compensation, and not even for a public purpose, but for private purpose, contrary to the Fifth Amendment and the Ninth Amendment.

The requirement that wages shall be fixed at a sum to maintain health and protect morals, provides a vague and uncertain standard incapable of application and renders the act void for this reason alone. 40 Stat. 960, §§ 9, 11.

The contention that employer or employee are not deprived of property rights because special licenses for defectives are provided for in the act, is unsound, because special licenses can not be obtained by the employer, nor by the employee as such, and, in any event, the wage is still fixed by the Board. 40 Stat. 960, 963, § 13.

The assignment of error in the action of the Court of Appeals in granting a rehearing on the first appeal from the Supreme Court of the District is without merit, because the present review is from the second appeal in the lower court, and not from the first appeal, and no question can be raised as to the authority of the court below to

hear and determine the second appeal. *Rooker* v. *Fidelity Trust Co.*, 261 U. S. 114. Further it is elementary that the granting or refusing of a rehearing in an equity suit is not the subject of review. *Steines* v. *Franklin County*, 14 Wall. 15; *Roemer* v. *Neumann*, 132 U. S. 103.

*Mr. William L. Brewster,* by leave of court, on behalf of the States of Oregon, New York, California, Kansas, Wisconsin and Washington, as *amicus curiae.*

By leave of court, briefs were filed by counsel, appearing as *amici curiae,* as follows: *Mr. Isaac H. Van Winkle,* Attorney General of the State of Oregon, *Mr. Joseph N. Teal* and *Mr. William L. Brewster,* on behalf of the Industrial Welfare Commission of Oregon. *Mr. Carl Sherman,* Attorney General of the State of New York, and *Mr. Edward G. Griffin,* Deputy Attorney General, on behalf of that State. *Mr. Hiram Johnson* and *Mr. Jesse Steinhart,* on behalf of the Industrial Welfare Commission of California. *Mr. John G. Egan,* Assistant Attorney General of the State of Kansas, on behalf of that State. *Mr. Herman L. Ekern,* Attorney General of the State of Wisconsin, *Mr. J. E. Messerschmidt,* Assistant Attorney General, and *Mr. Fred M. Wilcox,* on behalf of that State. *Mr. Edward Clifford* and *Mr. Kenneth Durham* on behalf of the Minimum Wage Committee of the State of Washington.

Mr. Justice Sutherland delivered the opinion of the Court.

The question presented for determination by these appeals is the constitutionality of the Act of September 19, 1918, providing for the fixing of minimum wages for women and children in the District of Columbia. 40 Stat. 960, c. 174.

The act provides for a board of three members, to be constituted, as far as practicable, so as to be equally repre-

sentative of employers, employees and the public. The board is authorized to have public hearings, at which persons interested in the matter being investigated may appear and testify, to administer oaths, issue subpoenas requiring the attendance of witnesses and production of books, etc., and to make rules and regulations for carrying the act into effect.

By § 8 the board is authorized—

"(1), To investigate and ascertain the wages of women and minors in the different occupations in which they are employed in the District of Columbia; (2), to examine, through any member or authorized representative, any book, pay roll or other record of any employer of women or minors that in any way appertains to or has a bearing upon the question of wages of any such women or minors; and (3), to require from such employer full and true statements of the wages paid to all women and minors in his employment."

And by § 9, " to ascertain and declare, in the manner hereinafter provided, the following things: (a), Standards of minimum wages for women in any occupation within the District of Columbia, and what wages are inadequate to supply the necessary cost of living to any such women workers to maintain them in good health and to protect their morals; and (b), standards of minimum wages for minors in any occupation within the District of Columbia, and what wages are unreasonably low for any such minor workers."

The act then provides (§ 10) that if the board, after investigation, is of opinion that any substantial number of women workers in any occupation are receiving wages inadequate to supply them with the necessary cost of living, maintain them in health and protect their morals, a conference may be called to consider and inquire into and report on the subject investigated, the conference to be equally representative of employers and employees in

such occupation and of the public, and to include one or more members of the board.

The conference is required to make and transmit to the board a report including, among other things, " recommendations as to standards of minimum wages for women workers in the occupation under inquiry and as to what wages are inadequate to supply the necessary cost of living to women workers in such occupation and to maintain them in health and to protect their morals."   § 11.

The board is authorized (§ 12) to consider and review these recommendations and to approve or disapprove any or all of them.   If it approve any recommendations it must give public notice of its intention and hold a public hearing at which the persons interested will be heard.   After such hearing, the board is authorized to make such order as to it may appear necessary to carry into effect the recommendations, and to require all employers in the occupation affected to comply therewith.   It is made unlawful for any such employer to violate in this regard any provision of the order or to employ any woman worker at lower wages than are thereby permitted.

There is a provision (§ 13) under which the board may issue a special license to a woman whose earning capacity " has been impaired by age or otherwise," authorizing her employment at less than the minimum wages fixed under the act.

All questions of fact (§ 17) are to be determined by the board, from whose decision there is no appeal; but an appeal is allowed on questions of law.

Any violation of the act (§ 18) by an employer or his agent or by corporate agents is declared to be a misdemeanor, punishable by fine and imprisonment.

Finally, after some further provisions not necessary to be stated, it is declared (§ 23) that the purposes of the act are " to protect the women and minors of the District

from conditions detrimental to their health and morals, resulting from wages which are inadequate to maintain decent standards of living; and the Act in each of its provisions and in its entirety shall be interpreted to effectuate these purposes."

The appellee in the first case is a corporation maintaining a hospital for children in the District. It employs a large number of women in various capacities, with whom it had agreed upon rates of wages and compensation satisfactory to such employees, but which in some instances were less than the minimum wage fixed by an order of the board made in pursuance of the act. The women with whom appellee had so contracted were all of full age and under no legal disability. The instant suit was brought by the appellee in the Supreme Court of the District to restrain the board from enforcing or attempting to enforce its order on the ground that the same was in contravention of the Constitution, and particularly the due process clause of the Fifth Amendment.

In the second case the appellee, a woman twenty-one years of age, was employed by the Congress Hall Hotel Company as an elevator operator, at a salary of $35 per month and two meals a day. She alleges that the work was light and healthful, the hours short, with surroundings clean and moral, and that she was anxious to continue it for the compensation she was receiving and that she did not earn more. Her services were satisfactory to the Hotel Company and it would have been glad to retain her but was obliged to dispense with her services by reason of the order of the board and on account of the penalties prescribed by the act. The wages received by this appellee were the best she was able to obtain for any work she was capable of performing and the enforcement of the order, she alleges, deprived her of such employment and wages. She further averred that she could not secure any other position at which she could make a living, with

as good physical and moral surroundings, and earn as good wages, and that she was desirous of continuing and would continue the employment but for the order of the board. An injunction was prayed as in the other case.

The Supreme Court of the District denied the injunction and dismissed the bill in each case. Upon appeal the Court of Appeals by a majority first affirmed and subsequently, on a rehearing, reversed the trial court. Upon the first argument a justice of the District Supreme Court was called in to take the place of one of the Appellate Court justices, who was ill. Application for rehearing was made and, by the court as thus constituted, was denied. Subsequently, and during the term, a rehearing was granted by an order concurred in by two of the Appellate Court justices, one being the justice whose place on the prior occasion had been filled by the Supreme Court member. Upon the rehearing thus granted, the Court of Appeals, rejecting the first opinion, held the act in question to be unconstitutional and reversed the decrees of the trial court. Thereupon the cases were remanded, and the trial court entered decrees in pursuance of the mandate, declaring the act in question to be unconstitutional and granting permanent injunctions. Appeals to the Court of Appeals followed and the decrees of the trial court were affirmed. It is from these final decrees that the cases come here.

Upon this state of facts the jurisdiction of the lower court to grant a rehearing, after first denying it, is challenged. We do not deem it necessary to consider the matter farther than to say that we are here dealing with the second appeals, while the proceedings complained of occurred upon the first appeals. That the lower court could properly entertain the second appeals and decide the cases does not admit of doubt; and this the appellants virtually conceded by having themselves invoked the jurisdiction. See *Rooker* v. *Fidelity Trust Co., ante,* 114.

We come then, at once, to the substantive question involved.

The judicial duty of passing upon the constitutionality of an act of Congress is one of great gravity and delicacy. The statute here in question has successfully borne the scrutiny of the legislative branch of the government, which, by enacting it, has affirmed its validity; and that determination must be given great weight. This Court, by an unbroken line of decisions from Chief Justice Marshall to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an act of Congress until overcome beyond rational doubt. But if by clear and indubitable demonstration a statute be opposed to the Constitution we have no choice but to say so. The Constitution, by its own terms, is the supreme law of the land, emanating from the people, the repository of ultimate sovereignty under our form of government. A congressional statute, on the other hand, is the act of an agency of this sovereign authority and if it conflict with the Constitution must fall; for that which is not supreme must yield to that which is. To hold it invalid (if it be invalid) is a plain exercise of the judicial power—that power vested in courts to enable them to administer justice according to law. From the authority to ascertain and determine the law in a given case, there necessarily results, in case of conflict, the duty to declare and enforce the rule of the supreme law and reject that of an inferior act of legislation which, transcending the Constitution, is of no effect and binding on no one. This is not the exercise of a substantive power to review and nullify acts of Congress, for no such substantive power exists. It is simply a necessary concomitant of the power to hear and dispose of a case or controversy properly before the court, to the determination of which must be brought the test and measure of the law.

The statute now under consideration is attacked upon the ground that it authorizes an unconstitutional inter- ference with the freedom of contract included within the guaranties of the due process clause of the Fifth Amendment. That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause, is settled by the decisions of this Court and is no longer open to question. *Allgeyer* v. *Louisiana,* 165 U. S. 578, 591; *New York Life Insurance Co.* v. *Dodge,* 246 U. S. 357, 373-374; *Coppage* v. *Kansas,* 236 U. S. 1, 10, 14; *Adair* v. *United States,* 208 U. S. 161; *Lochner* v. *New York,* 198 U. S. 45; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *Muller* v. *Oregon,* 208 U. S. 412, 421. Within this liberty are contracts of employment of labor. In making such contracts, generally speaking, the parties have an equal right to obtain from each other the best terms they can as the result of private bargaining.

In *Adair* v. *United States, supra,* Mr. Justice Harlan (pp. 174, 175), speaking for the Court, said:

" The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell. . . . In all such particulars the employer and employé have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land."

In *Coppage* v. *Kansas, supra* (p. 14), this Court, speaking through Mr. Justice Pitney, said:

" Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this

right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money.

"An interference with this liberty so serious as that now under consideration, and so disturbing of equality of right, must be deemed to be arbitrary, unless it be supportable as a reasonable exercise of the police power of the State."

There is, of course, no such thing as absolute freedom of contract. It is subject to a great variety of restraints. But freedom of contract is, nevertheless, the general rule and restraint the exception; and the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances. Whether these circumstances exist in the present case constitutes the question to be answered. It will be helpful to this end to review some of the decisions where the interference has been upheld and consider the grounds upon which they rest.

(1) *Those dealing with statutes fixing rates and charges to be exacted by businesses impressed with a public interest.* There are many cases, but it is sufficient to cite *Munn* v. *Illinois,* 94 U. S. 113. The power here rests upon the ground that where property is devoted to a public use the owner thereby, in effect, grants to the public an interest in the use which may be controlled by the public for the common good to the extent of the interest thus created. It is upon this theory that these statutes have been upheld and, it may be noted in passing, so upheld even in respect of their incidental and injurious or destructive effect upon preëxisting contracts. See *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467. In the case at bar the statute does not depend upon

the existence of a public interest in any business to be affected, and this class of cases may be laid aside as inapplicable.

(2) *Statutes relating to contracts for the performance of public work.* Atkin v. Kansas, 191 U. S. 207; Heim v. McCall, 239 U. S. 175; Ellis v. United States, 206 U. S. 246. These cases sustain such statutes as depending, not upon the right to condition private contracts, but upon the right of the government to prescribe the conditions upon which it will permit work of a public character to be done for it, or, in the case of a State, for its municipalities. We may, therefore, in like manner, dismiss these decisions from consideration as inapplicable.

(3) *Statutes' prescribing the character, methods and time for payment of wages.* Under this head may be included *McLean* v. *Arkansas,* 211 U. S. 539, sustaining a state statute requiring coal to be measured for payment of miners' wages before screening; *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, sustaining a Tennessee statute requiring the redemption in cash of store orders issued in payment of wages; *Erie R. R. Co.* v. *Williams,* 233 U. S. 685, upholding a statute regulating the time within which wages shall be paid to employees in certain specified industries; and other cases sustaining statutes of like import and effect. In none of the statutes thus sustained, was the liberty of employer or employee to fix the amount of wages the one was willing to pay and the other willing to receive interfered with. Their tendency and purpose was to prevent unfair and perhaps fraudulent methods in the payment of wages and in no sense can they be said to be, or to furnish a precedent for, wage-fixing statutes.

(4) *Statutes fixing hours of labor.* It is upon this class that the greatest emphasis is laid in argument and therefore, and because such cases approach most nearly the line of principle applicable to the statute here involved, we shall consider them more at length. In some instances

the statute limited the hours of labor for men in certain occupations and in others it was confined in its application to women. No statute has thus far been brought to the attention of this Court which by its terms, applied to all occupations. In *Holden v. Hardy,* 169 U. S. 366, the Court considered an act of the Utah legislature, restricting the hours of labor in mines and smelters. This statute was sustained as a legitimate exercise of the police power, on the ground that the legislature had determined that these particular employments, when too long pursued, were injurious to the health of the employees, and that, as there were reasonable grounds for supporting this determination on the part of the legislature, its decision in that respect was beyond the reviewing power of the federal courts.

That this constituted the basis of the decision is emphasized by the subsequent decision in *Lochner v. New York,* 198 U. S. 45, reviewing a state statute which restricted the employment of all persons in bakeries to ten hours in any one day. The Court referred to *Holden v. Hardy, supra,* and, declaring it to be inapplicable, held the statute unconstitutional as an unreasonable, unnecessary and arbitrary interference with the liberty of contract and therefore void under the Constitution.

Mr. Justice Peckham, speaking for the Court (p. 56), said:

" It must, of course, be conceded that there is a limit to the valid exercise of the police power by the State. There is no dispute concerning this general proposition. Otherwise the Fourteenth Amendment would have no efficacy and the legislatures of the States would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power

would be a mere pretext—become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint."

And again (pp. 57–58):

" It is a question of which of two powers or rights shall prevail—the power of the State to legislate or the right of the individual to liberty of person and freedom of contract. The mere assertion that the subject relates though but in a remote degree to the public health does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate, before an act can be held to be valid which interferes with the general right of an individual to be free in his person and in his power to contract in relation to his own labor."

Coming then directly to the statute (p. 58), the Court said:

" We think the limit of the police power has been reached and passed in this case. There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health or the health of the individuals who are following the trade of a baker. If this statute be valid, and if, therefore, a proper case is made out in which to deny the right of an individual, *sui juris,* as employer or employé, to make contracts for the labor of the latter under the protection of the provisions of the Federal Constitution, there would seem to be no length to which legislation of this nature might not go."

And, after pointing out the unreasonable range to which the principle of the statute might be extended, the Court said (p. 60):

" It is also urged, pursuing the same line of argument, that it is to the interest of the State that its population should be strong and robust, and therefore any legislation which may be said to tend to make people healthy must

be valid as health laws, enacted under the police power. If this be a valid argument and a justification for this kind of legislation, it follows that the protection of the Federal Constitution from undue interference with liberty of person and freedom of contract is visionary, wherever the law is sought to be justified as a valid exercise of the police power. Scarcely any law but might find shelter under such assumptions, and conduct, properly so called, as well as contract, would come under the restrictive sway of the legislature."

And further (p. 61):

"Statutes of the nature of that under review, limiting the hours in which grown and intelligent men may labor to earn their living, are mere meddlesome interferences with the rights of the individual, and they are not saved from condemnation by the claim that they are passed in the exercise of the police power and upon the subject of the health of the individual whose rights are interfered with, unless there be some fair ground, reasonable in and of itself, to say that there is material danger to the public health or to the health of the employés, if the hours of labor are not curtailed."

Subsequent cases in this Court have been distinguished from that decision, but the principles therein stated have never been disapproved.

In *Bunting* v. *Oregon*, 243 U. S. 426, a state statute forbidding the employment of any person in any mill, factory or manufacturing establishment more than ten hours in any one day, and providing payment for overtime not exceeding three hours in any one day at the rate of time and a half of the regular wage, was sustained on the ground that, since the state legislature and State Supreme Court had found such a law necessary for the preservation of the health of employees in these industries, this Court would accept their judgment, in the absence of facts to support the contrary conclusion. The law was attacked

on the ground that it constituted an attempt to fix wages, but that contention was rejected and the law sustained as a reasonable regulation of hours of service.

*Wilson* v. *New*, 243 U. S. 332, involved the validity of the so-called Adamson Law, which established an eight-hour day for employees of interstate carriers for which it fixed a scale of minimum wages with proportionate increases for overtime, to be enforced, however, only for a limited period. The act was sustained primarily upon the ground that it was a regulation of a business charged with a public interest. The Court, speaking through the Chief Justice, pointed out that regarding " the private right and private interest as contradistinguished from the public interest the power exists between the parties, the employers and employees, to agree as to a standard of wages free from legislative interference " but that this did not affect the power to deal with the matter with a view to protect the public right, and then said (p. 353):

"And this emphasizes that there is no question here of purely private right since the law is concerned only with those who are engaged in a business charged with a public interest where the subject dealt with as to all the parties is one involved in that business and which we have seen comes under the control of the right to regulate to the extent that the power to do so is appropriate or relevant to the business regulated."

Moreover, in sustaining the wage feature, of the law, emphasis was put upon the fact (p. 345) that it was in this respect temporary " leaving the employers and employees free as to the subject of wages to govern their relations by their own agreements after the specified time." The act was not only temporary in this respect, but it was passed to meet a sudden and great emergency. This feature of the law was sustained principally because the parties, for the time being, could not or would not agree. Here they are forbidden to agree.

The same principle was applied in the *Rent Cases* (*Block* v. *Hirsh,* 256 U. S. 135, and *Marcus Brown Hold-ing Co.* v. *Feldman,* 256 U. S. 170), where this Court sustained the legislative power to fix rents as between landlord and tenant upon the ground that the operation of the statutes was temporary to tide over an emergency and that the circumstances were such as to clothe " the letting of buildings . . . with a public interest so great as to justify regulation by law." The Court said (p. 157):

" The regulation is put and justified only as a tempo-. rary measure [citing *Wilson* v. *New, supra*]. A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change."

In a subsequent case, *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416, this Court, after saying " We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change," pointed out that the *Rent Cases* dealt with laws intended to meet a temporary emergency and " went to the verge of the law."

In addition to the cases cited above, there are the decisions of this Court dealing with laws especially relating to hours of labor for women: *Muller* v. *Oregon,* 208 U. S. 412; *Riley* v. *Massachusetts,* 232 U. S. 671; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *McLaughlin,* 236 U. S. 385.

In the *Muller Case* the validity of an Oregon statute, forbidding the employment of any female in certain industries more than ten hours during any one day was upheld. The decision proceeded upon the theory that the difference between the sexes may justify a different rule respecting hours of labor in the case of women than in the case of men. It is pointed out that these consist in differences of physical structure, especially in respect

of the maternal functions, and also in the fact that historically woman has always been dependent upon man, who has established his control by superior physical strength. The cases of *Riley, Miller* and *Bosley* follow in this respect the *Muller Case*. But the ancient inequality of the sexes, otherwise than physical, as suggested in the *Muller Case* (p. 421) has continued "with diminishing intensity." In view of the great—not to say revolutionary—changes which have taken place since that utterance, in the contractual, political and civil status of women, culminating in the Nineteenth Amendment, it is not unreasonable to say that these differences have now come almost, if not quite, to the vanishing point. In this aspect of the matter, while the physical differences must be recognized in appropriate cases, and legislation fixing hours or conditions of work may properly take them into account, we cannot accept the doctrine that women of mature age, *sui juris*, require or may be subjected to restrictions upon their liberty of contract which could not lawfully be imposed in the case of men under similar circumstances. To do so would be to ignore all the implications to be drawn from the present day trend of legislation, as well as that of common thought and usage, by which woman is accorded emancipation from the old doctrine that she must be given special protection or be subjected to special restraint in her contractual and civil relationships. In passing, it may be noted that the instant statute applies in the case of a woman employer contracting with a woman employee as it does when the former is a man.

The essential characteristics of the statute now under consideration, which differentiate it from the laws fixing hours of labor, will be made to appear as we proceed. It is sufficient now to point out that the latter as well as the statutes mentioned under paragraph (3), deal with incidents of the employment having no necessary effect upon

the heart of the contract, that is, the amount of wages
to be paid and received. A law forbidding work to con-
tinue beyond a given number of hours leaves the parties
free to contract about wages and thereby equalize what-
ever additional burdens may be imposed upon the em-
ployer as a result of the restrictions as to hours, by an
adjustment in respect of the amount of wages. Enough
has been said to show that the authority to fix hours of la-
bor cannot be exercised except in respect of those occupa-
tions where work of long continued duration is detrimental
to health. This Court has been careful in every case where
the question has been raised, to place its decision upon
this limited authority of the legislature to regulate hours
of labor and to disclaim any purpose to uphold the legis-
lation as fixing wages, thus recognizing an essential differ-
ence between the two. It seems plain that these deci-
sions afford no real support for any form of law estab-
lishing minimum wages.

If now, in the light furnished by the foregoing excep-
tions to the general rule forbidding legislative interfer-
ence with freedom of contract, we examine and analyze
the statute in question, we shall see that it differs from
them in every material respect. It is not a law dealing
with any business charged with a public interest or with
public work, or to meet and tide over a temporary emer-
gency. It has nothing to do with the character, methods
or periods of wage payments. It does not prescribe hours
of labor or conditions under which labor is to be done.
It is not for the protection of persons under legal disa-
bility, or for the prevention of fraud. It is simply and
exclusively a price-fixing law, confined to adult women
(for we are not now considering the provisions relating
to minors), who are legally as capable of contracting for
themselves as men. It forbids two parties having lawful
capacity—under penalties as to the employer—to freely
contract with one another in respect of the price for

which one shall render service to the other in a purely private employment where both are willing, perhaps anxious, to agree, even though the consequence may be to oblige one to surrender a desirable engagement and the other to dispense with the services of a desirable employee.[1] The price fixed by the board need have no relation to the capacity or earning power of the employee, the number of hours which may happen to constitute the day's work, the character of the place where the work is to be done, or the circumstances or surroundings of the employment; and, while it has no other basis to support its validity than the assumed necessities of the employee, it takes no account of any independent resources she may have. It is based wholly on the opinions of the members of the board and their advisers—perhaps an average of their opinions, if they do not precisely agree—as to what will be necessary to provide a living for a woman, keep her in health and preserve her morals. It applies to any and every occupation in the District, without regard to its nature or the character of the work.

The standard furnished by the statute for the guidance of the board is so vague as to be impossible of practical application with any reasonable degree of accuracy. What is sufficient to supply the necessary cost of living for a woman worker and maintain her in good health and protect her morals is obviously not a precise or unvarying sum—not even approximately so. The amount will depend upon a variety of circumstances: the individual temperament, habits of thrift, care, ability to buy necessaries intelligently, and whether the woman live alone or with her family. To those who practice economy, a given sum will afford comfort, while to those of contrary habit the same sum will be wholly inadequate. The coöperative economies of the family group are not taken into account

---

[1] This is the exact situation in the Lyons case, as is shown by the statement in the first part of this opinion.

though they constitute an important consideration in estimating the cost of living, for it is obvious that the individual expense will be less in the case of a member of a family than in the case of one living alone. The relation between earnings and morals is not capable of standardization. It cannot be shown that well paid women safeguard their morals more carefully than those who are poorly paid. Morality rests upon other considerations than wages; and there is, certainly, no such prevalent connection between the two as to justify a broad attempt to adjust the latter with reference to the former. As a means of safeguarding morals the attempted classification, in our opinion, is without reasonable basis. No distinction can be made between women who work for others and those who do not; nor is there ground for distinction between women and men, for, certainly, if women require a minimum wage to preserve their morals men require it to preserve their honesty. For these reasons, and others which might be stated, the inquiry in respect of the necessary cost of living and of the income necessary to preserve health and morals, presents an individual and not a composite question, and must be answered for each individual considered by herself and not by a general formula prescribed by a statutory bureau.

This uncertainty of the statutory standard is demonstrated by a consideration of certain orders of the board already made. These orders fix the sum to be paid to a woman employed in a place where food is served or in a mercantile establishment, at $16.50 per week; in a printing establishment, at $15.50 per week; and in a laundry, at $15 per week, with a provision reducing this to $9 in the case of a beginner. If a woman employed to serve food requires a minimum of $16.50 per week, it is hard to understand how the same woman working in a printing establishment or in a laundry is to get on with an income lessened by from $1 to $7.50 per week. The board prob-

ably found it impossible to follow the indefinite standard of the statute, and brought other and different factors into the problem; and this goes far in the direction of demonstrating the fatal uncertainty of the act, an infirmity which, in our opinion, plainly exists.

The law takes account of the necessities of only one party to the contract. It ignores the necessities of the employer by compelling him to pay not less than a certain sum, not only whether the employee is capable of earning it, but irrespective of the ability of his business to sustain the burden, generously leaving him, of course, the privilege of abandoning his business as.an alternative for going on at a loss. Within the limits of the minimum sum, he is precluded, under penalty of fine and imprisonment, from adjusting compensation to the differing merits of his employees. It compels him to pay at least the sum fixed in any event, because the employee needs it, but requires no service of equivalent value from the employee. It therefore undertakes to solve but one-half of the problem. The other half is the establishment of a corresponding standard of efficiency, and this forms no part of the policy of the legislation, although in practice the former half without the latter must lead to ultimate failure, in accordance with the inexorable law that no one can continue indefinitely to take out more than he puts in without ultimately exhausting the supply. The law is not confined to the great and powerful employers but embraces those whose bargaining power may be as weak as that of the employee. It takes no account of periods of stress and business depression, of crippling losses, which may leave the employer himself without adequate means of livelihood. To the extent that the sum fixed exceeds the fair value of the services rendered, it amounts to a compulsory exaction from the employer for the support of a partially indigent person, for whose condition there

rests upon him no peculiar responsibility, and therefore, in effect, arbitrarily shifts to his shoulders a burden which, if it belongs to anybody, belongs to society as a whole.

The feature of this statute which, perhaps more than any other, puts upon it the stamp of invalidity is that it exacts from the employer an arbitrary payment for a purpose and upon a basis having no causal connection with his business, or the contract or the work the employee engages to do. The declared basis, as already pointed out, is not the value of the service rendered, but the extraneous circumstance that the employee needs to get a prescribed sum of money to insure her subsistence, health and morals. The ethical right of every worker, man or woman, to a living wage may be conceded. One of the declared and important purposes of trade organizations is to secure it. And with that principle and with every legitimate effort to realize it in fact, no one can quarrel; but the fallacy of the proposed method of attaining it is that it assumes that every employer is bound at all events to furnish it. The moral requirement implicit in every contract of employment, viz, that the amount to be paid and the service to be rendered shall bear to each other some relation of just equivalence, is completely ignored. The necessities of the employee are alone considered and these arise outside of the employment, are the same when there is no employment, and as great in one occupation as in another. Certainly the employer by paying a fair equivalent for the service rendered, though not sufficient to support the employee, has neither caused nor contributed to her poverty. On the contrary, to the extent of what he pays he has relieved it. In principle, there can be no difference between the case of selling labor and the case of selling goods. If one goes to the butcher, the baker or grocer to buy food, he is morally entitled to obtain the worth of his money but he is not entitled to more. If what he gets is worth what he pays he is not justified in demanding

more simply because he needs more; and the shopkeeper, having dealt fairly and honestly in that transaction, is not concerned in any peculiar sense with the question of his customer's necessities.   Should a statute undertake to vest in a commission power to determine the quantity of food necessary for individual support and require the shopkeeper, if he sell to the individual at all, to furnish that quantity at not more than a fixed maximum, it would undoubtedly fall before the constitutional test.   The fallacy of any argument in support of the validity of such a statute would be quickly exposed.   The argument in support of that now being considered is equally fallacious, though the weakness of it may not be so plain.   A statute requiring an employer to pay in money, to pay at prescribed and regular intervals, to pay the value of the services rendered, even to pay with fair relation to the extent of the benefit obtained from the service, would be understandable.   But a statute which prescribes payment without regard to any of these things and solely with relation to circumstances apart from the contract of employment, the business affected by it and the work done under it, is so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States.

We are asked, upon the one hand, to consider the fact that several States have adopted similar statutes, and we are invited, upon the other hand, to give weight to the fact that three times as many States, presumably as well informed and as anxious to promote the health and morals of their people, have refrained from enacting such legislation.   We have also been furnished with a large number of printed opinions approving the policy of the minimum wage, and our own reading has disclosed a large number to the contrary.   These are all proper enough for the consideration of the lawmaking bodies, since their tendency is to establish the desirability or undesirability of the

legislation; but they reflect no legitimate light upon the question of its validity, and that is what we are called upon to decide. The elucidation of that question cannot be aided by counting heads.

It is said that great benefits have resulted from the operation of such statutes, not alone in the District of Columbia but in the several States, where they have been in force. A mass of reports, opinions of special observers and students of the subject, and the like, has been brought before us in support of this statement, all of which we have found interesting but only mildly persuasive. That the earnings of women now are greater than they were formerly and that conditions affecting women have become better in other respects may be conceded, but convincing indications of the logical relation of these desirable changes to the law in question are significantly lacking. They may be, and quite probably are, due to other causes. We cannot close our eyes to the notorious fact that earnings everywhere in all occupations have greatly increased—not alone in States where the minimum wage law obtains but in the country generally—quite as much or more among men as among women and in occupations outside the reach of the law as in those governed by it. No real test of the economic value of the law can be had during periods of maximum employment, when general causes keep wages up to or above the minimum; that will come in periods of depression and struggle for employment when the efficient will be employed at the minimum rate while the less capable may not be employed at all.

Finally, it may be said that if, in the interest of the public welfare, the police power may be invoked to justify the fixing of a minimum wage, it may, when the public welfare is thought to require it, be invoked to justify a maximum wage. The power to fix high wages connotes, by like course of reasoning, the power to fix low wages. If, in the face of the guaranties of the Fifth

Amendment, this form of legislation shall be legally justified, the field for the operation of the police power will have been widened to a great and dangerous degree. If, for example, in the opinion of future lawmakers, wages in the building trades shall become so high as to preclude people of ordinary means from building and owning homes, an authority which sustains the minimum wage will be invoked to support a maximum wage for building laborers and artisans, and the same argument which has been here urged to strip the employer of his constitutional liberty of contract in one direction will be utilized to strip the employee of his constitutional liberty of contract in the opposite direction. A wrong decision does not end with itself: it is a precedent, and, with the swing of sentiment, its bad influence may run from one extremity of the arc to the other.

It has been said that legislation of the kind now under review is required in the interest of social justice, for whose ends freedom of contract may lawfully be subjected to restraint. The liberty of the individual to do as he pleases, even in innocent matters, is not absolute. It must frequently yield to the common good, and the line beyond which the power of interference may not be pressed is neither definite nor unalterable but may be made to move, within limits not well defined, with changing need and circumstance. Any attempt to fix a rigid boundary would be unwise as well as futile. But, nevertheless, there are limits to the power, and when these have been passed, it becomes the plain duty of the courts in the proper exercise of their authority to so declare. To sustain the individual freedom of action contemplated by the Constitution, is not to strike down the common good but to exalt it; for surely the good of society as a whole cannot be better served than by the preservation against arbitrary restraint of the liberties of its constituent members.

It follows from what has been said that the act in question passes the limit prescribed by the Constitution, and, accordingly, the decrees of the court below are

*Affirmed.*

MR. JUSTICE BRANDEIS took no part in the consideration or decision of these cases.

MR. CHIEF JUSTICE TAFT, dissenting.

I regret much to differ from the Court in these cases.

The boundary of the police power beyond which its exercise becomes an invasion of the guaranty of liberty under the Fifth and Fourteenth Amendments to the Constitution is not easy to mark. Our Court has been laboriously engaged in pricking out a line in successive cases. We must be careful, it seems to me, to follow that line as well as we can and not to depart from it by suggesting a distinction that is formal rather than real.

Legislatures in limiting freedom of contract between employee and employer by a minimum wage proceed on the assumption that employees, in the class receiving least pay, are not upon a full level of equality of choice with their employer and in their necessitous circumstances are prone to accept pretty much anything that is offered. They are peculiarly subject to the overreaching of the harsh and greedy employer. The evils of the sweating system and of the long hours and low wages which are characteristic of it are well known. Now, I agree that it is a disputable question in the field of political economy how far a statutory requirement of maximum hours or minimum wages may be a useful remedy for these evils, and whether it may not make the case of the oppressed employee worse than it was before. But it is not the function of this Court to hold congressional acts invalid simply because they are passed to carry out economic views which the Court believes to be unwise or unsound.

Legislatures which adopt a requirement of maximum hours or minimum wages may be presumed to believe that when sweating employers are prevented from paying unduly low wages by positive law they will continue their business, abating that part of their profits, which were wrung from the necessities of their employees, and will concede the better terms required by the law; and that while in individual cases hardship may result, the restriction will enure to the benefit of the general class of employees in whose interest the law is passed and so to that of the community at large.

The right of the legislature under the Fifth and Fourteenth Amendments to limit the hours of employment on the score of the health of the employee, it seems to me, has been firmly established. As to that, one would think, the line had been pricked out so that it has become a well formulated rule. In *Holden* v. *Hardy,* 169 U. S. 366, it was applied to miners and rested on the unfavorable environment of employment in mining and smelting. In *Lochner* v. *New York,* 198 U. S. 45, it was held that restricting those employed in bakeries to ten hours a day was an arbitrary and invalid interference with the liberty of contract secured by the Fourteenth Amendment. Then followed a number of cases beginning with *Muller* v. *Oregon,* 208 U. S. 412, sustaining the validity of a limit on maximum hours of labor for women to which I shall hereafter allude, and following these cases came *Bunting* v. *Oregon,* 243 U. S. 426. In that case, this Court sustained a law limiting the hours of labor of any person, whether man or woman, working in any mill, factory or manufacturing establishment to ten hours a day with a proviso as to further hours to which I shall hereafter advert. The law covered the whole field of industrial employment and certainly covered the case of persons employed in bakeries. Yet the opinion in the *Bunting Case* does not mention the *Lochner Case.* No one can

suggest any constitutional distinction between employment in a bakery and one in any other kind of a manufacturing establishment which should make a limit of hours in the one invalid, and the same limit in the other permissible. It is impossible for me to reconcile the *Bunting Case* and the *Lochner Case* and I have always supposed that the *Lochner Case* was thus overruled *sub silentio*. Yet the opinion of the Court herein in support of its conclusion quotes from the opinion in the *Lochner Case* as one which has been sometimes distinguished but never overruled. Certainly there was no attempt to distinguish it in the *Bunting Case*.

However, the opinion herein does not overrule the *Bunting Case* in express terms, and therefore I assume that the conclusion in this case rests on the distinction between a minimum of wages and a maximum of hours in the limiting of liberty to contract. I regret to be at variance with the Court as to the substance of this distinction. In absolute freedom of contract the one term is as important as the other, for both enter equally into the consideration given and received, a restriction as to one is not any greater in essence than the other, and is of the same kind. One is the multiplier and the other the multiplicand.

If it be said that long hours of labor have a more direct effect upon the health of the employee than the low wage, there is very respectable authority from close observers, disclosed in the record and in the literature on the subject quoted at length in the briefs, that they are equally harmful in this regard. Congress took this view and we can not say it was not warranted in so doing.

With deference to the very able opinion of the Court and my brethren who concur in it, it appears to me to exaggerate the importance of the wage term of the contract of employment as more inviolate than its other terms. Its conclusion seems influenced by the fear that the

concession of the power to impose a minimum wage must carry with it a concession of the power to fix a maximum wage. This, I submit, is a *non sequitur*. A line of distinction like the one under discussion in this case is, as the opinion elsewhere admits, a matter of degree and practical experience and not of pure logic. Certainly the wide difference between prescribing a minimum wage and a maximum wage could as a matter of degree and experience be easily affirmed.

Moreover, there are decisions by this Court which have sustained legislative limitations in respect to the wage term in contracts of employment. In *McLean* v. *Arkansas,* 211 U. S. 539, it was held within legislative power to make it unlawful to estimate the graduated pay of miners by weight after screening the coal. In *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, it was held that store orders issued for wages must be redeemable in cash. In *Patterson* v. *Bark Eudora,* 190 U. S. 169, a law forbidding the payment of wages in advance was held valid. A like case is *Strathearn S. S. Co.* v. *Dillon,* 252 U. S. 348. While these did not impose a minimum on wages, they did take away from the employee the freedom to agree as to how they should be fixed, in what medium they should be paid, and when they should be paid, all features that might affect the amount or the mode of enjoyment of them. The first two really rested on the advantage the employer had in dealing with the employee. The third was deemed a proper curtailment of a sailor's right of contract in his own interest because of his proneness to squander his wages in port before sailing. In *Bunting* v. *Oregon, supra,* employees in a mill, factory or manufacturing establishment were required if they worked over ten hours a day to accept for the three additional hours permitted not less than fifty per cent. more than their usual wage. This was sustained as a mild penalty imposed on the employer to enforce the limitation as to hours; but it neces-

sarily curtailed the employee's freedom to contract to work for the wages he saw fit to accept during those three hours. I do not feel, therefore, that either on the basis of reason, experience or authority, the boundary of the police power should be drawn to include maximum hours and exclude a minimum wage.

Without, however, expressing an opinion that a minimum wage limitation can be enacted for adult men, it is enough to say that the case before us involves only the application of the minimum wage to women. If I am right in thinking that the legislature can find as much support in experience for the view that a sweating wage has as great and as direct a tendency to bring about an injury to the health and morals of workers, as for the view that long hours injure their health, then I respectfully submit that *Muller* v. *Oregon*, 208 U. S. 412, controls this case. The law which was there sustained forbade the employment of any female in any mechanical establishment or factory or laundry for more than ten hours. This covered a pretty wide field in women's work and it would not seem that any sound distinction between that case and this can be built up on the fact that the law before us applies to all occupations of women with power in the board to make certain exceptions. Mr. Justice Brewer, who spoke for the Court in *Muller* v. *Oregon*, based its conclusion on the natural limit to women's physical strength and the likelihood that long hours would therefore injure her health, and we have had since a series of cases which may be said to have established a rule of decision. *Riley* v. *Massachusetts*, 232 U. S. 671; *Miller* v. *Wilson*, 236 U. S. 373; *Bosley* v. *McLaughlin*, 236 U. S. 385. The cases covered restrictions in wide and varying fields of employment and in the later cases it will be found that the objection to the particular law was based not on the ground that it had general application but because it left out some employments.

I am not sure from a reading of the opinion whether the Court thinks the authority of *Muller* v. *Oregon* is shaken by the adoption of the Nineteenth Amendment. The Nineteenth Amendment did not change the physical strength or limitations of women upon which the decision in *Muller* v. *Oregon* rests. The Amendment did give women political power and makes more certain that legislative provisions for their protection will be in accord with their interests as they see them. But I don't think we are warranted in varying constitutional construction based on physical differences between men and women, because of the Amendment.

But for my inability to agree with some general observations in the forcible opinion of MR. JUSTICE HOLMES who follows me, I should be silent and merely record my concurrence in what he says. It is perhaps wiser for me, however, in a case of this importance, separately to give my reasons for dissenting.

I am authorized to say that MR. JUSTICE SANFORD concurs in this opinion.

MR. JUSTICE HOLMES, dissenting.

The question in this case is the broad one, Whether Congress can establish minimum rates of wages for women in the District of Columbia with due provision for special circumstances, or whether we must say that Congress has no power to meddle with the matter at all. To me, notwithstanding the deference due to the prevailing judgment of the Court, the power of Congress seems absolutely free from doubt. The end, to remove conditions leading to ill health, immorality and the deterioration of the race, no one would deny to be within the scope of constitutional legislation. The means are means that have the approval of Congress, of many States, and of those governments from which we have learned our greatest

lessons. When so many intelligent persons, who have studied the matter more than any of us can, have thought that the means are effective and are worth the price, it seems to me impossible to deny that the belief reasonably may be held by reasonable men. If the law encountered no other objection than that the means bore no relation to the end or that they cost too much I do not suppose that anyone would venture to say that it was bad. I agree, of course, that a law answering the foregoing requirements might be invalidated by specific provisions of the Constitution. For instance it might take private property without just compensation. But in the present instance the only objection that can be urged is found within the vague contours of the Fifth Amendment, prohibiting the depriving any person of liberty or property without due process of law. To that I turn.

The earlier decisions upon the same words in the Fourteenth Amendment began within our memory and went no farther than an unpretentious assertion of the liberty to follow the ordinary callings. Later that innocuous generality was expanded into the dogma, Liberty of Contract. Contract is not specially mentioned in the text that we have to construe. It is merely an example of doing what you want to do, embodied in the word liberty. But pretty much all law consists in forbidding men to do some things that they want to do, and contract is no more exempt from law than other acts. Without enumerating all the restrictive laws that have been upheld I will mention a few that seem to me to have interfered with liberty of contract quite as seriously and directly as the one before us. Usury laws prohibit contracts by which a man receives more than so much interest for the money that he lends. Statutes of frauds restrict many contracts to certain forms. Some Sunday laws prohibit practically all contracts during one-seventh of our whole life. Insurance rates may be regulated. *German Alliance Insurance Co.*

v. *Lewis,* 233 U. S. 389. (I concurred in that decision without regard to the public interest with which insurance was said to be clothed. It seemed to me that the principle was general.) Contracts may be forced upon the companies. *National Union Fire Insurance Co.* v. *Wanberg,* 260 U. S. 71. Employers of miners may be required to pay for coal by weight before screening. *McLean* v. *Arkansas,* 211 U. S. 539. Employers generally may be required to redeem in cash store orders accepted by their employees in payment. *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13. Payment of sailors in advance may be forbidden. *Patterson* v. *Bark Eudora,* 190 U. S. 169. The size of a loaf of bread may be established. *Schmidinger* v. *Chicago,* 226 U. S. 578. The responsibility of employers to their employees may be profoundly modified. *New York Central R. R. Co.* v. *White,* 243 U. S. 188. *Arizona Employers' Liability Cases,* 250 U. S. 400. Finally women's hours of labor may be fixed; *Muller* v. *Oregon,* 208 U. S. 412; *Riley* v. *Massachusetts,* 232 U. S. 671, 679; *Hawley* v. *Walker,* 232 U. S. 718; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *McLaughlin,* 236 U. S. 385; and the principle was extended to men with the allowance of a limited overtime to be paid for " at the rate of time and one-half of the regular wage," in *Bunting* v. *Oregon,* 243 U. S. 426.

I confess that I do not understand the principle on which the power to fix a minimum for the wages of women can be denied by those who admit the power to fix a maximum for their hours of work. I fully assent to the proposition that here as elsewhere the distinctions of the law are distinctions of degree, but I perceive no difference in the kind or degree of interference with liberty, the only matter with which we have any concern, between the one case and the other. The bargain is equally affected whichever half you regulate. *Muller* v. *Oregon,* I take it, is as good law today as it was in 1908. It will

need more than the Nineteenth Amendment to convince me that there are no differences between men and women, or that legislation cannot take those differences into account. I should not hesitate to take them into account if I thought it necessary to sustain this act. *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 63. But after *Bunting* v. *Oregon,* 243 U. S. 426, I had supposed that it was not necessary, and that *Lochner* v. *New York,* 198 U. S. 45, would be allowed a deserved repose.

This statute does not compel anybody to pay anything. It simply forbids employment at rates below those fixed as the minimum requirement of health and right living. It is safe to assume that women will not be employed at even the lowest wages allowed unless they earn them, or unless the employer's business can sustain the burden. In short the law in its character and operation is like hundreds of so-called police laws that have been upheld. I see no greater objection to using a Board to apply the standard fixed by the act than there is to the other commissions with which we have become familiar, or than there is to the requirement of a license in other cases. The fact that the statute warrants classification, which like all classifications may bear hard upon some individuals, or in exceptional cases, notwithstanding the power given to the Board to issue a special license, is no greater infirmity than is incident to all law. But the ground on which the law is held to fail is fundamental and therefore it is unnecessary to consider matters of detail.

The criterion of constitutionality is not whether we believe the law to be for the public good. We certainly cannot be prepared to deny that a reasonable man reasonably might have that belief in view of the legislation of Great Britain, Victoria and a number of the States of this Union. The belief is fortified by a very remarkable collection of documents submitted on behalf of the appellants, material here, I conceive, only as showing that the

belief reasonably may be held.   In Australia the power to fix a minimum for wages in the case of industrial disputes extending beyond the limits of any one State was given to a Court, and its President wrote a most interesting account of its operation.   29 Harv. Law Rev. 13.   If a legislature should adopt what he thinks the doctrine of modern economists of all schools, that " freedom of contract is a misnomer as applied to a contract between an employer and an ordinary individual employee," *ibid*. 25, I could not pronounce an opinion with which I agree impossible to be entertained by reasonable men.   If the same legislature should accept his further opinion that industrial peace was best attained by the device of a Court having the above powers, I should not feel myself able to contradict it, or to deny that the end justified restrictive legislation quite as adequately as beliefs concerning Sunday or exploded theories about usury.  I should have my doubts, as I have them about this statute—but they would be whether the bill that has to be paid for every gain, although hidden as interstitial detriments, was not greater than the gain was worth: a matter that it is not for me to decide.

I am of opinion that the statute is valid and that the decree should be reversed.