RAFAEL JULIO IRIZARRY, ETC., ET AL., Plaintiffs, Appellants and Appellees, *v.* PRUDENCIO RIVERA MARTÍNEZ, COMMISSIONER OF LABOR, Defendant, Appellee and Appellant.

Nos. 7623 and 7624. Argued January 26, 1939.—Decided April 19, 1940.

*Arturo Ortiz Toro, Oscar Souffront* and *Amador Rivera Silva* for plaintiffs, appellants and appellees. *George A. Malcolm, Attorney General, E. Campos del Toro, Assistant Attorney General,* for defendant, appellee and appellant.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The plaintiffs herein are owners of workshops for needle work where women above and below 18 years of age are employed. Ten per cent of the work is done in the factories or workshops of the plaintiffs, and the remaining ninety per cent is done by the workers in their respective homes.

On June 9, 1919, the Legislature of Puerto Rico passed Act No. 45 entitled: "Act establishing wages for working women, and for other purposes," which provides as follows:

"Section 1.—That it shall be unlawful for any employer of women, girls inclusive, in industrial occupations, or commercial, or public-service undertakings in Porto Rico, to pay them wages lower than those specified in this Section, to wit:

"Women under 18 years of age at the rate of four (4) dollars a week, and over said age at the rate of six (6) dollars a week. The first three weeks of apprenticeship shall be exempt from the provisions of 'this Section. The provisions of this Act shall not be applicable to agriculture and agricultural industries.

"Section 2.—That any employer paying any woman, girls included, wages lower than those specified in Section 1 shall be guilty of misdemeanor, and upon conviction shall be punished by fine not to exceed fifty (50) dollars nor less than five (5) dollars."

On May 31, 1937, the Commissioner of Labor of Puerto Rico notified all employers of women in industrial and commercial work and in public-service undertakings that Act No. 45, *supra,* had gone into effect in Puerto Rico not only as regards work done in workshops but also as regards work to be done by women in their homes; that under the provisions of said law it is compulsory for employers to pay their female employees over 18 years of age, not only to those working in the workshops but to those working at home, one (1) dollar per day as minimum wage, and four (4) dollars weekly to those under the above age; and that the provisions of said law shall be retroactively enforced as from April 1, 1937.

On June 11, 1937, the plaintiffs filed in the District Court of Mayagüez a complaint in civil action No. 27623, in which they sought a declaratory judgment, on the ground that Act No. 45, *supra,* is unconstitutional and void; that so long as the judgment rendered by the Supreme Court in *People of Puerto Rico* v. *Laurnaga & Co.,* 32 P.R.R. 766, is not reversed, said law continues to be unconstitutional and void; that it is not therein provided that the same is applicable to work done at home, and that, should it do so, it would be void as to that particular because it would constitute an unreasonable exercise of the sovereign power of the State and an arbitrary encroachment upon the freedom of contract; that the said law is unconstitutional and void because it violates the rights to liberty and property guaranteed by the Fifth and Fourteenth Amendments to the National Constitution

and by article 2 of the Organic Act, because it discriminates arbitrarily in favor of agricultural industries, as it is unreasonable not to take into consideration the ability of the worker or the nature of the work, and because it only takes into consideration the needs of the workers but not those of the employers. The plaintiffs pray for a judgment declaring that Act No. 45, *supra,* is void; that the plaintiffs are not bound to pay a minimum wage to female workers who do their work at home; that said law can not in any case be applied retroactively; and that any judgment that might be rendered in the premises shall be applied prospectively as soon as the same becomes final. In a separate petition the plaintiffs requested the issuance of an injunction *pendente lite.* The District Court of Mayagüez issued an order requiring the defendant to appear on June 18, 1937, and show cause why the injunction sought should not issue. On June 12, 1937, the same plaintiffs filed in the same court in action No. 27624 an injunction petition to enjoin the Commissioner of Labor from enforcing the minimum wage act. Both cases were transferred to the District Court of San Juan and on June 23, 1937, both cases were heard by the court in bank. On August 18, 1937, the district court rendered a judgment declaring Act No. 45, Session Laws of 1919, constitutional and effective in Puerto Rico; that said law is not applicable to work done at home; and that the declaration as to the validity of said law is not retroactive in so far as the same affects rights acquired under the decision in *People* v. *Laurnaga & Co., supra.* On the same day the district made an order granting the injunction petition as to the work to be done at home. Feeling aggrieved, the Commissioner of Labor appealed from both decisions and filed his appeals under numbers 7623 and 7624. We will consider and determine them in a single opinion.

The defendant and appellant claims that it was error for the lower court: to hold that Act No. 45, *supra,* is not applicable to work done at home; to grant the injunction

restraining the application of said law to the work done at home; and to hold that the said law is only applicable as from the time when the judgment should become final.

It does not appear from the record that the plaintiffs appealed from the judgment in so far as it is therein held that Act No. 45, *supra,* is valid and constitutional and shall apply to work done in workshops. We might decide that this part of the judgment has been confessed by the plaintiffs; but as the law in question is of so much importance and has been so much attacked, we will first take up the point raised by the plaintiffs as to the constitutionality of said law before considering the errors assigned by the appellant Commissioner.

■ The first attack against Act No. 45 of 1919 took place in *People* v. *Alvarez,* 28 P.R.R. 882, where in an unanimous opinion the Supreme Court held that the provisions of said act were valid and constitutional and that the law was applicable to work by the piece or weight.

In *People* v. *Porto Rican American Tobacco Co.,* 29 P.R.R. 371, the constitutionality of minimum wage law was again upheld and it was also held therein that its provisions were applicable not only to work by the hour but also to work by the piece.

When the same question was raised for the third time in *People* v. *Laurnaga & Co., supra,* this court, feeling bound to follow the decision of the U. S. Supreme Court in *Adkins* v. *Children's Hospital,* 261 U. S. 525, 67 L. Ed. 785, held:

". . . . The Supreme Court of the United States in *People* v. *Adkins,* by a vote of five to three, has considered that the obtaining a minimum wage is not a matter of health. Whatever the individual opinions of the judges of this court may be, we are necessarily concluded by the decision of the Supreme Court of the United States.

"Hence it must be held that section 1 of Act No. 45 of 1919 is unconstitutional and void."

Fourteen years passed between April 9, 1923, the date of the decision in *Adkins* v. *Children's Hospital, supra,* and

March 29, 1937, when the point of the constitutional validity of an act of the State of Washington establishing a minimum wage for women and minors was considered and determined by the U. S. Supreme Court in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 391; 81 L. Ed. 703. Adopting, as wiser and more liberal, the dissenting opinions of Justices Taft and Holmes in the *Adkins* case, *supra,* the U. S. Supreme Court in a majority opinion delivered by Chief Justice Hughes upheld the constitutional validity of the Washington statute and reversed its decision in the *Adkins* case, saying:

"The principle which must control our decision is not in doubt. The constitutional provision invoked is the due process clause of the Fourteenth Amendment governing the States, as the due process clause invoked in the *Adkins* case governed Congress. In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described:

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of ar-

bitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567.''

After analyzing those cases where the so-called freedom of contract has been constitutionally restrained by legislation, the Supreme Court of the United States went on saying:

''This array of precedents and the principles they applied were thought by the dissenting Justices in the *Adkins* case to demand that the minimum wage statute be sustained. The validity of the distinction made by the Court between a minimum wage and a maximum of hours in limiting liberty of contract was especially challenged. 261 U. S. p. 564. That challenge persists and is without any satisfactory answer. As Chief Justice Taft observed: 'In ab-solute freedom of contract the one term is as important as the other, for both enter equally into the consideration given and received, a restriction as to the one is not greater in essence than the other and is of the same kind. One is the multiplier and the other the multiplicand.' And Mr. Justice Holmes, while recognizing that 'the distinctions of the law are distinctions of degree,' could 'perceive no difference in the kind or degree of interference with liberty, the only matter with which we have any concern, between the one case and the other. The bargain is equally affected whichever half you regulate.'

''.   .  .  .  .  .

''. . . . The statement of Mr. Justice Holmes in the *Adkins* case is pertinent: 'This statute does not compel anybody to pay anything. It simply forbids employment at rates below those fixed as the minimum requirement of health and right living. It is safe to assume that women will not be employed at even the lowest wages allowed unless they earn them, or unless the employer's business can sustain the burden. In short the law in its character and operation is like hundreds of so-called police laws that have been upheld.' . . . .

''.   .  .  .  .  .

''. . . . What can be closer to the public interest than the health of women and their protection from unscrupulous and overreaching employers? And if the protection of women is a legitimate end of the exercise of state power, how can it be said that the requirement of the payment of a minimum wage fairly fixed in order to meet the very necessities of existence is not an admissible means to that

end? The legislature of the State was clearly entitled to consider the situation of women in employment, the fact that they are in the class receiving the least pay, that their bargaining power is relatively weak, and that they are the ready victims of those who would take advantage of their necessitous circumstances. . . .

"There is an additional and compelling consideration which recent economic experience has brought into a strong light. The exploitation of a class of workers who are in an unequal position with respect to bargaining power and are thus relatively defenceless against the denial of a living wage is not only detrimental to their health and well being but casts a direct burden for their support upon the community. What these workers lose in wages the taxpayers are called upon to pay. The bare cost of living must be met. . . ."

This is the first opportunity that has been presented to us for considering the question again, subsequent to the decision in *West Coast Hotel Co.* v. *Parrish, supra*. As there was reversed in the above case the decision in the *Adkins* case which we were compelled to follow in our decision in *People* v. *Laurnaga & Co., supra*, it is our duty to accept and apply to the case at bar the doctrine laid down in the *Parrish* case, and decide that Act No. 45 of June 9, 1919, is constitutionally valid and in force, and to reverse our decision in *People* v. *Laurnaga, supra*.

▇ The second point submitted for our decision is: Are the provisions of sections 1 and 2 of Act No. 45, supra, applicable to women working at home?

Accepting as valid and convincing the contention of the plaintiff employers, the lower court held that the said law is not applicable to work done at home, and set forth the following reasons in support of such decision:

"The law, as we have observed, is absolutely silent in this respect. It is necessary to resort to the rules of construction in order to determine the true intent of the legislator.

"According to the evidence heard in the case, the employer delivers the materials to his subagents who distribute the same among the female workers engaged to do the work. The subagent fixes a price per unit. The female worker receives, together with the materials, the pattern to be copied. There is no other relation between

the female worker and the employer except to deliver her work to him and receive the remuneration fixed. No specific time is fixed for the delivery of the work, it frequently happening that the same person works for several employers at the same time.

"" . . . . . . . . .

"Let us now see how the law would operate if we sought to apply the same to work done at home: Employer 'A', through his subagent, delivers to a female worker a certain amount of work to be done which she could reasonably do in the shop in a week. The female worker takes that work home, and either because of illness, inexperience, or because she is doing work for employers 'B' and 'C' at the same time, fails to deliver the work done at the end of the week and delivers the same two weeks later. How much shall he pay her under the law? 'A' can do nothing but to pay her two weeks, as she would allege that she worked during two weeks and the law is inflexible in fixing the amount of the wages.

"Let us take up another case. A female worker over 18 years of age is furnished with material which she reasonably can work up within a week. She takes it home but for some conceivable reason she does not do the work but passes it on to her daughter or to any other woman under 18 who, as we have seen, is entitled to a minimum wage of four (4) dollars weekly. When the work is finished the female worker who received it returns the same as having been done by her, and the employer, who is unable to show otherwise, must pay the work at the rate of six (6) dollars weekly, or in default thereof pay the proper fine. There is no doubt that such was not the intention of the lawmaker. This construction is not only absurd and as such should be rejected, but should it be adopted and the law held to cover work to be done at home, we should have to declare the same unconstitutional on the ground of depriving the employer of his property without due process of law.

"When in construing a statute we are confronted with two possible constructions—one which would render the law unconstitutional or, at least, would raise serious doubts as to its constitutionality, and another which would not affect the validity of the law—it is inevitably incumbent upon the court to save the law and to that end it must reject any interpretation that renders it unconstitutional or that might engender serious doubts as to its constitutionality and adopt one that does not affect its validity. (Citations.)

"The various cases that might arise from our construction of the law in the sense that the same is applicable to work done at home

shows beyond any reasonably doubt that the act, if so interpreted, would be unconstitutional, as that would amount to authorizing female workers to appropriate to themselves the employers' money and to compelling the latter to submit thereto under penalty of being criminally prosecuted. No mental effort is required, nor a great knowledge of constitutional law, to realize the arbitrariness and injustice that might result from such construction.

"        .        .        .        .        .        .        .        .        .

"We have come to the conclusion that our minimum wage law does not apply to work to be done at home. If the Commissioner of Labor should attempt to apply the act in question to such kind of work, he would not be acting on the strength of any law, his acts would not be the official acts of a public officer, and if so, the Commissioner, his agents or subordinates, would not be enforcing a public statute for the public benefit. *Durlach Bros., Inc.,* v. *Domenech, Treasurer,* 47 P.R.R. 617.

"It is quite clear that any attempt on the part of the Commissioner of Labor to enforce the act in question in connection with work to be done at home would necessarily affect the property rights of the plaintiffs. Nor are we blind to the necessity of the permanent injunction sought by the plaintiffs so as to prevent the defendant from encroaching upon their right to the freedom of contract in so far as the work to be done at home is concerned. The judgment would turn out to be entirely academic and the plaintiffs would be compelled to bring further proceedings to enforce their rights if we failed to grant the injunction sought. The defendant would thus be prevented from carrying out his purpose, already expressed, of criminally charging the plaintiffs with an alleged breach of the law in exercising their right to the freedom of contract in connection with the work to be done at home. We are not using the injunction to prevent any prosecution for breach of a penal statute, for although our minimum wage act might be considered to be such, work to be done at home is not included within the provisions of such act and, therefore, said statute is not infringed by any acts of the plaintiffs in connection with such work.

"Therefore, we must also issue a permanent injunction to prevent the Commissioner of Labor, personally or through his agents or subordinates, from prosecuting or in any way hindering the plaintiffs in their contracts for work to be done at home. See section 8 of the Uniform Declaratory Judgments Act and especially the mono-

graph which appears in 101 A.L.R. 689, and in *Gully* v. *Interstate Natural Gas Co.*, 82 F. (2d.) 145.''

We are not convinced by the arguments advanced by the lower court in support of the inapplicability of the minimum wage act to work to be done at home.

The clear and evident purpose of said act is to protect each and all of the women who find themselves compelled to work in industrial or commercial occupations, by requiring that they be paid the minimum wage which the legislator considers adequate and sufficient to guarantee them a healthy and happy standard of life. The law does not establish any distinction between females who work in workshops under direct supervision of the employer and those who do their work at home. *Ubi lex non distinguit, nec nos distinguere debemus.* The language of the statute is so clear that it was undoubtedly the intention of the legislator to bring within its provisions all female workers, irrespective of the place of work. From the arguments advanced in support of the inapplicability of the act to work to be done at home we fail to see any justification for us to hold that it was the intention of the legislator to deny statutory protection to and leave absolutely without defense ninety per cent of the women who earn their living in various needlework industries. The same arguments advanced in support of the constitutional validity of the statute concerning the work in workshops—health protection for female workers, better living conditions and protection from exploitation by employers—may be adduced for maintaining that the statute is and must be applicable to work done at home.

The lower court bases its arguments on a sequence of presumptions which, in our judgment, are opposed to those established and acknowledged by law. It presumes, as appears from the examples presented in order to show how the act would work if applied to work done at home, that the female worker, the recipient of work that reasonably could be done in a week, is unable, on account of illness,

inexperience or some other reason, to deliver the work at the end of the week and would deliver it two weeks later; and that she will demand payment for two weeks' work instead of the one week actually worked. All of which amounts to the presumption that the female workers are not going to do their duty and are going to attempt to defraud their employers, which is contrary to the rule of law that fraud is never presumed and to the legal presumptions that a person takes ordinary care of his own concerns and performs his duties and obligations. We must admit the possibility that some female worker or workers might attempt to defraud the employer, charging for time not employed in the work, but such possibility is not enough for depriving other female workers who perform their obligations of the benefits of a social and humane legislation enacted for their protection and well being.

The other example, that of the female worker over 18 years who, it is presumed, is going to let the work, which she undertook to do, to be done by a woman under 18 and thus fraudulently get the difference in the wage scales, is still less convincing and is subject to the same objections as the former. Moreover, even admitting that in some cases there might happen what the lower court points out would constitute such serious danger that it would amount to depriving the employer of his property without due process of law, how could an employer be injured, provided the work was duly and satisfactorily done, by the fact that the person who actually did the work was under 18 years of age? The possibility of such occurrence is no justification for the non-application of the statute to work done at home.

The obstacles and difficulties which in the opinion of the plaintiff employers make it impossible to apply the statute to the work done at home are more apparent than real and are not at all insurmountable. As the learned Justice Holmes said in the *Adkins* case: "It is safe to assume that women will not be employed at even the lowest wages

allowed unless they earn them, or unless the employer's business can sustain the burden.'' The employer has, in our opinion, without the necessity of setting up personal inspection or supervision of each of the female workers at home, ample and easy means of ascertaining whether or not a certain female worker has earned the wages agreed upon between the parties or the minimum wage fixed by the statute. By means of a simple arithmetical calculation it is possible to determine accurately the average amount of work done daily or weekly by a female worker who works in the shop. For instance, a workshop where one hundred female workers are engaged during the six days of the week and make 10,000 handkerchiefs weekly shows an average output of 100 handkerchiefs per week per female worker and an average of 16.66 handkerchiefs per female worker per day. If it is the duty of an employer to pay to a female worker whose output while working in the workshop is 16.66 handkerchiefs per day or 100 per week a salary not below that provided by law, we fail to see why a female worker who does her work at home should not be compensated in the same way and extent for the same amount of work executed on time to the satisfaction of the employer. To hold otherwise would amount to an unjustified discrimination against a competent and honest female worker who does her duty and who, for special reasons, is compelled to stay at home, forcing her to work for less than the statutory wages and leaving her exposed to become a propitiatory victim of employers, agents and intermediaries, whose gains increase in proportion as wages decrease. The employer can protect himself against the female worker at home who fails to turn out as much work as the worker in the shop, or who in any way attempts to defraud him, just as he would protect himself if there were no minimum wage law, by discharging her or by refusing to pay her that to which she is not justly entitled.

We have not been cited to any statute prohibiting the work by the piece in the needle industry. The difficulties pointed out which seem to be an obstacle to the application of the statute to work done at home might be easily overcome if employers, female workers and the Commissioner of Labor who is charged with the enforcement of the law, all of them acting in good faith and with the firm purpose of putting life into the statute, should fix the amount of work that could and should be done at home by a female worker per day, in each one of the different kinds of work, so as to earn and be entitled to claim and get the minimum wage as fixed by the statute. The execution and delivery of the amount of work so fixed would be the best evidence of the time consumed by each female worker. The latter would receive the statutory minimum wage, and the employer would have a more efficacious security than might be afforded by the clock or the inspector's supervision in the workshop. Let us give a final example: Material is delivered to a female worker for making 100 handkerchiefs in one week, which is the average output in the workshop. The delivery of the 100 handkerchiefs when finished—no matter when it is done—will be the best evidence that it took the female worker that time to do the work, and this would entitle her to be paid the minimum wage.

For the foregoing reasons we think that the lower court erred in holding that the act is not applicable to the work done at home and that the judgment appealed from must be modified in that respect.

■ The final question to be considered and decided by us is: When shall the declaration that the minimum wage act is constitutionally valid and applicable to the work in the shop as well as to the work at home begin to take effect?

Counsel for the defendant Commissioner maintains that the act must be considered to have come into effect as from April 1, 1937, pursuant to the judgment rendered by the U. S. Supreme Court in *West Coast Hotel Co.* v. *Parrish,*

*supra,* reversing the decision in the *Adkins* case, relied upon by this court for its decision in *People* v. *Laurnaga, supra.*

Upholding the contention of the plaintiffs the trial court held "that the declaration of the validity of said law is not retroactive in so far as the same affects rights acquired under the decision in *People* v. *Laurnaga & Co., supra.*"

The decision of the lower court in this particular complies with the law. It is generally held, where a decision of a higher court is reversed, that the reversal means that the decision reversed never existed. No right, therefore, may be alleged as having been acquired under the reversed decision. There is an exception to the rule, however, well established and recognized by all Federal courts, which reads as follows:

"Where a constitutional or statute law has received a given construction by the courts of last resort, and contracts have been made and rights acquired under and in accordance with such construction, such contracts may not be invalidated nor vested rights acquired under them impaired by a change of construction made by a subsequent decision." 7 R.C.L. 1010.

The application of the above rule to the case at bar seems to us just and equitable. The parties acted and contracted under the decision of this court in the *Laurnaga* case, whereby the minimum wage act was held to be unconstitutionally invalid. When entering into the work contract neither the employers nor the female workers had in mind a minimum wage established by an act that had been invalidated by a judgment rendered by the highest insular court. It would be unfair, under such circumstances, to compel now the employers to pay the difference, if any, between the wages at present paid and those established by the statute. See 85 A.L.R. 262, and 43 F. (2d) 513, 516.

For the foregoing reasons the judgment rendered in appeal No. 7623 must be modified as to the pronouncement that the Minimum Wage Act is not applicable to the work done at home, holding instead that said act is applicable to such

work done at home with the same force and effect as to the work done in shops and factories. So modified the judgment shall be affirmed in every respect.

It follows from the decision that the act is applicable to the work done in the home that appeal No. 7624 should be sustained, and that the permanent injunction order against the Commissioner of Labor issued by said lower court on August 18, 1937, should be reversed.

Mr. Justice De Jesús took no part in the decision of this case.