**Berry v. Berry**
*[Cite as 2 AOA 673]*

*Case No. CA88-11-081*
*Clermont County, (12th)*
*Decided March 12, 1990*

R.C.3105.18
R.C.3109.04

Kennedy and Zugelter, David S. McCune, 792 Eastgate South Drive, Suite 450, Cincinnati, Ohio 45245, for plaintiff-appellant

Barbeau & Hake, Carol C. Hake, 120 N. Market Street, Batavia, Ohio 45103, for defendant-appellee

JONES, P.J.

Plaintiff-appellant, Darlene Berry, and defendant-appellee, Michael Berry, were married on May 25, 1982. One child, Zachary, was born issue of the marriage on September 1, 1985. On September 23, 1987, appellant filed a complaint for divorce. Following separate hearings on the issues of child custody and property division, the trial court granted appellant a divorce on the grounds of gross neglect of duty. In addition, the court awarded custody of the minor child to appellee and equally divided the parties' property. The court denied appellant's post-decree motion for a new trial or, in the alternative, relief from judgment. Appellant timely appeals and submits the following assignments of error for review:

*First Assignment of Error*

"The decision of the trial court awarding custody to the defendant/appellee was contrary to law, against the manifest weight of the evidence and an abuse of the trial court's discretion."

*Second Assignment of Error*

"The trial court erred as a matter of law by sustaining defendant/appellee's objection to plaintiff/appellant's proposed testimony concerning prior inconsistent statements made by Tom Englehart concerning his wife Leslie Englehart."

*Third Assignment of Error*

"The trial court abused its discretion by awarding the defendant/appellee approximately one-half of the post tax proceeds from the sale of the plaintiff/appellant's business."

*Fourth Assignment of Error*

"The trial court erred as a matter of law in overruling plaintiff/appellant's motion for new trial which was based upon defendant/appellee's misrepresentations and/or lies."

I.

The trial court's custody award is the subject or appellant's first assignment of error. Appellant cites two reasons in support of her claim that the custody award was erroneous: first, the court failed to properly consider all relevant statutory factors under R.C. 3109.04; second, the facts and law did not support the court's finding that appellee was the child's primary caretaker. In its judgment entry and decree of divorce, the trial court made the following finding regarding the custody question:

"The court finds that the credible evidence established that plaintiff (wife) had an `affair' about one (1) or two (2) years ago. Defendant (husband) began a relationship with another party. Eventually this state of affairs led to defendant (husband) moving out of the marital residence. He took up residence with his new girlfriend who is still married. Subsequent to these events, plaintiff revived her relationship with her former fiance who now comes to the marital residence to spend every weekend with the plaintiff. Each party introduced exhibits which were photographs showing themselves and current companion with the child. Both plaintiff and defendant testified that they intended to marry their respective companions immediately after this divorce is final. From the credible testimony adduced, the two-year-old child has not yet been adversely affected by either of the parties' current relationships.

"At the July 22, 1988 hearing, the plaintiff (mother) testified that she intended to move to Texas after the finalization of this proceeding. At the hearing on August 23, 1988, the plaintiff's attorney indicated that plaintiff was not now going to move to Texas until this case is resolved. No testimony was produced to support this representation.

"The court further finds that based upon the credible evidence presented, the child and the father have a very good relationship and a close bond exists between them. Also from the evidence presented, it is evident that the child and mother have a good relationship. Both parties enjoyed and performed their roles as caregivers. The testimony revealed that the

plaintiff (wife) would fix the evening meal while the defendant (father) would feed, bathe and prepare the child for bed.

"The court appointed psychologist testified that both parents would be and are fit parents. The psychologist's report indicated some concern that the plaintiff (wife), if she were to obtain custody, would make it difficult for the husband to visit with his son. The psychologist noted that the plaintiff is a high energy person, and that she has an intense bitterness and general aggressivity which creates a vindictive attitude toward husband and affects her judgment regarding decisions in her personal life. The psychologist's report on the defendant found him to be more passive, in general, and less bitter.

"Both parents seek custody of their son. The defendant's girlfriend was described as a 35 year old woman who has been married and divorced three our four times since her 21st birthday. She was not called by either party to testify at any hearing. The plaintiff's boyfriend is a very successful, upwardly mobile business person who has recently been transferred to Texas. Plaintiff (wife) is concerned that defendant's girlfriend will move into the former marital residence if husband is awarded custody and be a disruptive influence on the child. No evidence was addressed to support this allegation; all present indication, as previously mentioned, shows no adverse effect on the child.

"Several of the child's extended family members reside in this area.

"The psychologist's concerns about the plaintiff's temperament was corroborated by other evidence. For example, since separation, when husband reduced his work week to four (4) days to have more time with his son, wife refused to allow him additional visitation without offering a valid reason. The court ordered *pendente lite* visitation order was rigidly adhered to by plaintiff.

"The plaintiff (wife) is an active, career-oriented person and has always held a full-time job during the six years of the marriage. She intends to complete college and then attend law school.

"Defendant (husband) is a self-employed builder/carpenter who works out of his house and has a flexible work schedule.

"Based on all the credible evidence presented and the demeanor of the witnesses, the court finds that the defendant (father) was the primary caretaker of the child during the marriage. Though both parties cared for the child, the father provided for the remedial needs of the child and his flexible work schedule permitted him to spend more time with the child than the mother did. The court also finds that the close bond between the father and the son would be disturbed if custody of the child was granted to the mother. Therefore, the court finds that it is in the best interest of the child to grant custody to the defendant (father)."

A.

With respect to substantive matters, the issue of child custody in a divorce action is wholly governed by R.C. 3109.04, which reads, in part, as follows:

"(A) Upon hearing the testimony of either or both parents and in accordance with sections 3109.21 to 3109.36 of the Revised Code, the court shall decide to whom the care, custody, and control of the children shall be given. The court may grant the care, custody, and control of the children to either parent ***. The court shall take into account that which would be in the best interest of the children ***.

"***

"(C) In determining the best interest of a child pursuant to this section, whether on an original award of custody or modification of custody, the court shall consider all relevant factors, including:

"(1) The wishes of the child's parents regarding his custody;

"(2) The wishes of the child regarding his custody if he is eleven years of age or older;

"(3) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;

"(4) The child's adjustment to his home, school, and community;

"(5) The mental and physical health of all persons involved the situation."

The trial court has broad discretion in granting an original custody award. *Baxter* v. *Baxter* (1971), 27 Ohio St. 2d 168. While the court's discretion in such matters is broad, it is not absolute and is subject to reversal upon a showing of an abuse of discretion. *Miller* v. *Miller* (1988), 37 Ohio St. 3d 71.

B.

Under R.C. 3109.04, the paramount standard for determining custody is the best interest of the child. *Boyer* v. *Boyer* (1976), 46 Ohio St. 2d 83, certiorari denied (1976), 429 U.S. 889, 97 S.Ct. 245; *Birch* v. *Birch* (1984), 11 Ohio St. 3d 85. The court is to consider the factors enumerated in R.C. 3109.04(C) in determining the child's best interest. Appellant first claims

that the trial court abused its discretion by failing to properly consider those factors enumerated in R.C. 3109.04(C) (3) and (5) which respectively concern the child's relationship with parents, siblings, and other persons who significantly affect the child's best interest, and the mental and physical health of all persons involved in the custody situation.

Appellant does not contend that the trial court failed to consider these factors; her position is that the court did not "properly" consider these factors in light of appellee's relationship with his girlfriend, Leslie Engelhart. As noted by the trial court, appellee's planned marriage to Engelhart will be Engelhart's fifth marriage in a fourteen year period. Engelhart was not subpoenaed by either party and did not testify at the custody hearing.

If it is appellant's contention that the trial court did not "properly" consider R.C. 3109.04(C) (3) and (5) because it failed to take into account Leslie Engelhart's inability to sustain a marital relationship of any enduring nature, such position is clearly unsupported by the court's decree. The court obviously considered appellee's proposed marriage to Engelhart and examined the relationship's impact upon the child. While the trial court concluded that young Zachary had "not yet been adversely affected" by his father's relationship with Engelhart, we cannot help but wonder whether appellee's proposed marriage to an individual whose past is characterized by a series of ephemeral relationships is truly in the child's best interest. On the basis of the record before us, we cannot say that the trial court failed to properly consider those factors set forth in R.C. 3109.04(C) (3) and (5) in formulating its custody award.

### C.

Under her second issue, appellant submits that the court's determination that appellee was the child's primary caretaker was against the weight of the evidence and contrary to law. The trial court concluded that although both parties cared for the child, appellee provided for the child's "remedial needs and spent more time with the child because of his flexible work schedule."

Although not specifically mentioned in R.C. 3109.04(C), the role of primary caretaker has been identified by some courts as a factor warranting consideration under R.C. 3109.04(C) (3). *Thompson* v. *Thompson* (1987), 31 Ohio App. 3d 254; and *In re Maxwell* (1982), 8 Ohio App. 3d 302. This court has likewise recognized the importance of the child's primary caretaker as a relevant factor in fashioning a custody award. See *e.g., Crout* v. *Crout* (Mar. 30, 1987), Brown App. No. CA86-09-014 (Jones, J., dissenting); *Bechtol* v. *Bechtol* (Sept. 6, 1988), Clermont App. No. CA88-02-014, unreported, motion to certify record granted (1988), 40 Ohio St. 3d 710; *Dom* v. *Dom* (Sept. 30, 1988), Butler App. No. CA87-07-099, unreported, motion to certify record overruled (1989), 41 Ohio St. 3d 706; and *Strong* v. *Strong* (Sept. 11, 1989), Butler App. No. CA89-02-024, unreported, motion to certify overruled (1989), 47 Ohio St. 3d 712.

In *Maxwell, supra,* at 305, the Darke County Court of Appeals identified the following parental duties as relevant criteria for determining which parent, by the performance of such duties, has assumed primary responsibility for the child's care:

"1) The preparation and planning of meals;

"2) Bathing, grooming and dressing;

"3) The purchase, cleaning, and care of clothing;

"4) Medical care, including nursing and trips to physicians;

"5) The arrangement for social interaction among peers;

"6) The arrangement of alternative care including babysitting and day care;

"7) Putting the child to bed at night, attending to the child in the middle of the night, and waking the child in the morning;

"8) The child's discipline, including general manners and toilet training;

"9) Education, including religious, cultural and social education; and

"10) Teaching elementary skills, including reading, writing and arithmetic.

The trial court premised its determination that appellee was the primary caretaker upon a finding that appellee provided for the child's remedial needs and had a flexible work schedule which permitted him to spend more time with the child. The record reveals that at the time of the child's birth, both parties were self-employed and had their own businesses. Appellant took a leave of absence from her job immediately following the child's birth but returned to work four weeks later. While the divorce action was pending, appellee reduced his work week from five to four days so as to spend more time with the child. Appellant sold her business approximately six months after the parties' separation to primarily apply herself towards child care responsibilities.

Appellee claimed he was responsible for eighty to ninety per cent of child care duties. The court's observation that appellee provided for the child's remedial needs appears to be based upon the testimony of appellee, appellee's parents and several friends who claimed that whenever they were in the presence of the parties and the child, appellee seemed to always attend to changing the child's diapers or providing him a drink of water.

This suggests that appellee's child care responsibilities were principally centered around the *Maxwell* decision's second, seventh and eighth duties. In fact, the evidence of appellee's caretaker role focuses almost exclusively upon these three aspects of child care. The record reflects that appellant also shared in these responsibilities and assumed the principal task of meal preparation and planning. Appellant also testified that she assumed responsibility for the child's laundry, shopping and medical care during the four weeks immediately following the child's birth and there is nothing to suggest that appellant did not continue to meet these needs after she returned to work.

When appellant returned to work, the parties' neighbor, Colleen Morgan, became the child's babysitter. According to Morgan, appellant would bring the child to Morgan's residence in the morning while appellee would pick up the child in the evenings. Contrary to appellee's testimony that he would feed Zachary in the morning before appellee took the child to the sitter, Morgan stated that she usually fed the child his breakfast after he had been delivered. When the child turned two, the parties placed him in a day care center.

Considering the *Maxwell* parental duties, the child's tender years removes the significance of the fifth, ninth and tenth duties. As to the remaining responsibilities, the record clearly demonstrates that both parties participated in these duties which, in some instances, was to the complete exclusion of one or the other. Under such circumstances, where the parents share in the child care responsibility to the degree reflected by the record herein, it cannot be said that one parent is the child's "primary caretaker" or more of a caretaker than the other parent.

The flexible work schedule which the court determined permitted appellee to spend more time with the child does not render appellee the primary caretaker. In fact, appellant, having sold her business, does not work at all and has what may be considered the epitome of a flexible work schedule. We accordingly conclude that the trial court's finding that appellee was the child's primary caretaker was against the weight of the evidence. *Strong, supra.* The parties equally assumed the responsibility for the child's care and neither can be said to be the primary caretaker.

We also observed, however, that the primary caretaker is but only one of several factors the court must weigh in its custodial determination. *Crout, supra.* No single factor is determinative of the child's best interest; rather, a custodial determination must be made in light of the totality of the circumstances. *Id.* We therefore find it necessary to review the custody award in light of all factors set forth in R.C. 3109.04 to determine if the award was in the child's best interest. Furthermore, because the trial court has broad discretion in an original custody award, such a decision cannot be reversed absent an abuse of discretion, which entails something more than merely being against the weight of the evidence. *Baxter, supra.* Simply because the trial court's finding on the matter of the child's primary caretaker was against the weight of the evidence, it does not follow that the custody award constituted an abuse of discretion. It is therefore necessary to review the custody award in its entirety, taking into consideration the parties' shared roles as the child's caretakers.

### D.

In determining the child's best interest, the court is to consider the wishes of the child's parents regarding custody. R.C. 3109.04(C)(1). It is readily apparent that both parties desire custody of the child. Because of the child's tender years, he is incapable of expressing his wishes with respect to the custody question. R.C. 3109.04(C)(2).

The trial court determined that the child had a good relationship with both parents, a finding which is clearly supported by the record. R.C. 3109.04(C)(3). The court further found that there was no evidence that the child had been adversely affected by either parent's present relationship. Although the court noted that several members of the child's extended family resided in the area, there was little indication as to how much weight, if any, the trial court gave to this particular factor. As of the custody hearing, the child was not quite three years of age and obviously had not yet had the opportunity to become "adjusted" to a school or community. R.C. 3109.04(C)(4).

The final statutory factor, the mental and physical health of all person involved in the situation, was addressed in the court's remarks concerning the parties' psychological profiles. These profiles were developed by the court-appointed psychologist, Dr. Charles Handel. Handel, whom appellee's counsel referred to as "Judge Handel" during oral arguments to this court, testified that both parties would be proper parents and did not recommend one party over the other. Handel was concerned, however, that if appellant, whom he described as an action oriented individual, was granted custody, her prospective move to Houston would result in the lack of any extended family for the child.

The court noted its concern with appellant's vindictive attitude toward appellee resulting in part from the anger and bitterness she experienced over the separation. Although this personality trait certainly merits consideration, so too does Handel's testimony regarding appellee's passive and less bitter nature which, according to Handel, caused appellee to avoid confrontations requiring resolution so much so that appellee permitted such situations to reach crisis proportion before taking any action.

Although it is evident that the trial court considered the statutory factors of R.C. 3109.04(C), the court found that the child's best interest required a custody award to appellee for two principal reasons: appellee was the child's primary caretaker and there was a close bond between appellee and the child which would be disrupted if appellant was granted custody. We have already determined that the court's finding as to the primary caretaker issue was against the weight of the evidence. While appellee's relationship with the child would admittedly be disturbed if appellant was granted custody and moved to Houston, the disruption would be no greater than that which will inevitably occur to appellant's relationship with the child as a result of the custody award to appellee.

Having reviewed the entire record in light of R.C. 3109.04(C), we conclude that both parties are, as evidenced by the record, suitable parents and each is capable of attending to the child's needs. We do not agree, however, with the trial court's conclusion that the child's best interest requires a custody award to appellee. Regardless of which parent receives custody, the same basic problems of geographical separation from the non-custodial parent and the presence of an individual who would stand in the place of the non-custodial parent will result.

Appellant asserts that a custody award to her would be in the child's best interest since she has had custody of the child since September 1987 which, when coupled with the child's young age or tender years, should favor appellant as the child's custodian. While appellant cannot bootstrap herself into a preferred custodial position through a temporary custody order, the tender years concept presents an interesting factor for consideration.

E.

While R.C. 3109.03 recognizes no distinction, based on parenthood, between the rights of a father and those of a mother to custody of children, the mother's first privilege to nurture and care for children was recognized at common law based upon the perception that the best interest of child of tender years were ordinarily served when assured the love, care and attention of its mother. 46 Ohio Jurisprudence 3d (1983) 262, 263, Family Law, Section 309. See, e.g., Clark v. Bayer (1877), 32 Ohio St. 299; Lawyer v. Lawyer (App. 1933), 14 Ohio Law Abs. 33; Elford v. Elford (App. 1942), 36 Ohio Law Abs. 397; and Speckman v. Speckman (App. 1954), 70 Ohio Law Abs. 506.

The preference for the mother as the custodial parent, the "tender years doctrine," created a presumption that a mother was entitled to custody of a child of tender years in the absence of proof that the mother was unfit to be the child's custodian. Lawyer, supra. In Charles v. Charles 1985), 23 Ohio App. 3d 109, the Franklin County Court of Appeals held that a custody award to a mother predicated solely upon a presumption that the mother was entitled to custody of a child of tender years constituted reversible error. Writing for the court, Judge Alan Norris concluded that the General Assembly's enactment of the Divorce Reform Act (H.B. 233, effective September 23, 1974), which adopted the standard of the child's best interest as the sole test for selecting a custodial parent, reflected a legislative intent to reject the use of the tender years doctrine and the determination of custody based upon the sex of the custodian. To support his position, Judge Norris relied upon his own commentary on the Divorce Reform Act. Norris Divorce Reform, Ohio Style (1974), 47 Ohio Bar 1031, at 1035. See, also, Norris Ohio's Divorce Reform Act -- Expectation and Realization (1986), 13 Ohio N.U.L. Rev. 173, at 192. Other courts have taken similar positions. See Maxwell, supra; and Kiskis v. Kiskis (Dec. 23, 1983), Meigs App. No. 330, unreported.

Although these cases would appear to eliminate any reliance upon the doctrine, the *Maxwell* court recognized that consideration of a child's tender years is not entirely in disrepute. Admittedly, the court states that a mother should not "*** be given preference in a custody determination *merely* because of the tender years of a child." *Maxwell, supra,* at 304. (Emphasis added.) However, in quoting an "eloquently written opinion" of the West Virginia Supreme Court in *Garska* v. *McCoy* (W.Va. 1981), 278 S.E. 2d 357, the *Maxwell* court stated the following:

"In those custody disputes where the facts demonstrate that child care and custody are shared in an entirely equal way, then indeed no presumption arises and the court must proceed to inquire further into relative degrees of parental competence. However, where one parent can demonstrate with regard to a child of *tender years* that he or she is clearly the primary caretaker parent, then the court must further determine only whether the primary caretaker parent is a fit parent. Where the primary caretaker parent achieves the minimum, objective standard of behavior which qualifies him or her as a fit parent, the trial court must award the child to the primary caretaker parent." (Emphasis added.)

*Maxwell, supra,* at 305, 306. See, also, Hamman v. *Hamman* (Aug. 30, 1985), Paulding App. No. 11-84-6, unreported (although tender years is not, in and of itself, conclusive in custody determinations, it is nevertheless a relevant factor to be considered with all other relevant factors in determining the child's best interest.)

R.C. 3109.04(C) precludes a *presumptive* quality on the primary caretaker factor, *Maxwell, supra,* at 306. In the same manner, although R.C. 3109.04 removes the *presumption* created by the tender years doctrine, the statute does not specifically prohibit or preclude consideration of a child's tender years or young age when such is relevant to a determination of the child's best interest no more than it prohibits consideration of the parental role of primary caretaker. Thus a child's tender years, like the primary caretaker role, may be a *relevant* factor which merits consideration in a custody award. See *McLaughlin* v. *McLaughlin* (June 28, 1989), Washington App. No. 88 CA 4, unreported. A husband and wife "*** stand upon an equality as to the care, custody, and control of [their] offspring, so far as parenthood is involved." R.C. 3109.03.

Accordingly, neither parent is to enjoy a custodial preference at the outset of a custody proceeding. However, it would be absurd to hold, as a matter of law, that a child's tender years is never relevant in a custody dispute, especially if the case involves a baby nursing at the mother's breast. Under such circumstances, the child's age or tender years is an extremely significant factor for evaluating the child's best interest. No matter how equal parents may be in the eyes of the legislature or the judiciary, neither the General Assembly nor the courts can alter the natural differences between the male and female of the species. As Justice Oliver Wendell Holmes once observed: "It will take more than the Nineteenth Amendment to convince me that there no differences between men and women, or that legislation cannot take those differences into account." *Adkins* v. *Children's Hospital* (1923), 261 U.S. 525, 569, 570, 43 S.Ct. 394, 405 (Holmes, J., dissenting). In other words, while they are equal, they are still different.

The tender years doctrine was based upon a *presumption* that a young child's best interest was ordinarily served when "assured the love, care and attention of its mother," *Elford, supra,* at 403, and because the infant's mother has the "mother love necessary to the rearing of the child." *Lawyer, supra,* at 34. The tender years doctrine presumably found disfavor with the legislature because "a large proportion of mothers had joined the work force and an increasing number of fathers were seeking custody." *Norris,* Ohio's Divorce Reform Act, *supra,* at 192.

Significantly, the Ohio Supreme Court has never specifically rejected the tender years doctrine. Therefore, if, after due consideration of all other relevant factors, it cannot be clearly demonstrated whether custody with one parent or the other would be in the child's best interest, the young age of a child may still have the same validity it has enjoyed for years where it would be in the best interest of a child of tender years to be with the mother if she is a good parent and not unfit. In other words, a mother is not presumed to be the preferred parent because the custody dispute involves a child of tender years. Rather, the child's tender years is a *factor* which merits consideration in determining the child's best interest and may be the determinative factor if consideration of all other factors still results in relative equality between the parents.

There is no evidence in the case at bar that appellant is an unfit parent and would be unable to take care of the child. In addition, a

review of those factors of R.C. 3109.04 as well as the primary caretaker role and other relevant factors may very well lead to the conclusion that the interest of this child of tender years will best served by awarding custody to the mother. We therefore conclude that the custody award was against the weight of the evidence and constituted an abuse of discretion. The first assignment of error is, accordingly, sustained.

## II.

In her second assignment of error, appellant claims the trial court erroneously excluded extrinsic evidence of the prior inconsistent statement of a witness who testified on behalf of appellee.

The focus of this assignment of error is appellant's unsuccessful attempt to impeach the credibility of Thomas Engelhart, who at the time of the custody hearing was Lesli Engelhart's husband. Thomas Engelhart testified favorably regarding appellee's relationship with Leslie Engelhart, as well as appellee's and Leslie's relationship with Zachary and the Engelhart's daughter.

On cross-examination, counsel extensively questioned Engelhart about prior telephone conversations and a luncheon meeting during which Englehart allegedly made several disfavorable comments about his wife to appellant. Although Engelhart admitted the conversations and meeting, he denied making such prior statements to appellant. On rebuttal, counsel called appellant to testify regarding Thomas Engelhart's prior inconsistent statements. The trial court sustained appellee's objection and excluded appellant's testimony which counsel then proffered for the record.

The introduction of a witness's prior inconsistent statements is governed by Evid. R. 613(B) which provides that:

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interest of justice otherwise require ***."

Before extrinsic evidence of a prior inconsistent statement can be admitted for impeachment purposes, the witness must be given the opportunity to explain or deny the prior inconsistent statement. *State* v. *Riggins* (1986), 35 Ohio App. 3d 1. If the witness denies making the statement, a proper foundation has been laid and extrinsic evidence is admissible

provided such does not relate to a collateral matter. *Id.*

Thomas Engelhart's testimony reflected upon appellee's and Leslie Engelhart's ability to parent the parties' child, testimony which is relevant to the custodial factor enumerated in R.C. 3109.04(C) (3). The prior inconsistent statements offered by appellant were designed to impeach Thomas Engelhart's credibility. Appellee asserts that the evidence is inadmissible under Evid. R. 613(B) as extrinsic or external evidence because it consisted of appellant's testimony. We find such argument unpersuasive since extrinsic evidence under the rule consists of evidence of a prior statement which is introduced after the witness sought to be impeached has steeped down. 1 Weissenberger (1989) Ohio Evidence Section 613.3, 77. Consequently, extrinsic evidence may assume the form of testimony from another witness so long as it is introduced other than through the testimony of the witness who is the subject of the impeachment. *Id.*

On cross-examination, Thomas Engelhart was questioned about the time, place and person involved in the alleged contradictory statements and denied ever having made them. This satisfied the requirement of a proper foundation for the introduction of prior inconsistent statements. *State* v. *Talbert* (1986), 33 Ohio App. 3d 282, 284. Prior to the attempted introduction of the inconsistent statements, counsel for appellee was afforded an opportunity to question Engelhart about the statements. *Id.* Thus, appellant had satisfied the prerequisites for the introduction of prior inconsistent statements. Since these statements were relevant to Thomas Engelhart's credibility regarding a factor which required consideration in the court's custodial determination, we find that the trial court abused its discretion in precluding the use of prior inconsistent statements for impeachment purposes. *Riggins, supra.*

The second assignment of error is hereby sustained.

## III.

Appellant's third assignment of error claims the trial court abused its discretion in awarding appellee one-half of the post-tax proceeds from the sale of appellant's business.

The record reveals that the parties had a financial arrangement whereby each maintained their own savings from their respective jobs and equally shared household and living expenses. At the time of their marriage, appellant was employed in the transportation business while

appellee had his own construction and remodeling business, In January 1984, appellant purchased her own business at a cost of $20,000. She paid $5,000 from her own savings while the balance was secured by a second mortgage on the marital property. In June 1988, appellant sold her business for $75,000, at which time $12,000 remained on the mortgage used to secure its purchase. Appellant used $20,000 of the sales proceeds for living expenses while the remaining $55,000 was placed in escrow.

According to the record, appellant made the mortgage payments and paid most, if not all, of the major bills and regular household bills from the proceeds of her business. Appellee's construction business produced little income during the marriage. There is evidence, however, that appellee put a great deal of labor into remodeling the marital residence. The parties also received a $10,000 loan from appellee's parents, secured by a third mortgage on the residence, which was used for the purchase of remodeling materials. The trial court found that the labor furnished by appellee, the $10,000 loan, and appellant's mortgage payments all went into improving the marital residence which, having been purchased by the parties for $45,000, had appreciated to a value of $103,000.

The court ordered the sale of the marital residence with the proceeds to be equally divided after satisfying the three mortgages. The court also equally divided the post-tax proceeds of the $55,000 balance remaining from the sale of appellant's business. The court equally divided appellee's construction business valued at $6,720 and offset appellant's share from the proceeds awarded to appellee from the sale of her business.

Appellant claims that the court abused its discretion by awarding appellee one-half of the post-tax proceeds of appellee's business. Marital property is to be divided as the court deems equitable by taking into consideration all relevant factors including those expressly set forth in R.C. 3105.18(B). The court's ultimate objective is to fairly and equitably divide the marital property between the parties. Although a potentially equal division should be the starting point, it has been held that a division need not be equal to be equitable. See *Cherry* v. *Cherry* (1981), 66 Ohio St. 2d 348; *Kaechele* v. *Kaechele* (1988), 35 Ohio St. 3d 93. By the same token, an equal division of property is not necessarily equitable. In reviewing the equity of a property division, we must determine whether

the trial court abused its discretion in formulating its division of the marital assets and liabilities of the parties. *Worthington* v. *Wothington* (1986), 21 Ohio St. 3d 73; *Martin* v. *Martin* (1985), 18 Ohio St. 3d 292.

The record reveals that neither party contributed to the success of the other's business. Each party received the benefit of his or her respective business and pursuant to their financial arrangements, each party was responsible for his or her respective business obligations. It is possible that appellee's lack of substantial income may be attributed to the amount of time and material he devoted to the improvement of the marital residence. If so, he should be compensated accordingly by receiving a proportionate share in the marital residence. We find, however, that the trial court abused its discretion in awarding each party a one-half interest in the other's business. Neither party contributed to the success of the other's business and each should receive the full benefit of his or her labor. If, however, appellant is to receive the entire proceeds from the sale of her business, she should also be responsible for the complete satisfaction of the second mortgage used to acquire her business.

We therefore find that the trial court abused its discretion in awarding appellee one-half of the post-tax proceeds from the sale of appellant;s business. the third assignment of error is hereby sustained.

### IV.

For her final assignment of error, appellant claims that the trial court erred in overruling her motion for a new trial.

Appellant argues that she should have been granted a new trial on the basis of appellee's "repeated misrepresentations and/or lies." Given our disposition of the first three assignments of error, we conclude that this assignment is also well-taken and should be sustained, although not for the specific reasons asserted by appellant.

### V.

We accordingly conclude that the trial court abused its discretion in terms of both the custody award and division of property. We accordingly reverse the trial court on these matters and hereby remand the matter for further proceedings on the issues of child custody and division of marital property.

*Judgment reversed*
*and cause remanded.*

KOEHLER, J., Concurs separately.
YOUNG, J., dissents.

KOEHLER, J., Concurring separately:

I write separately in concurrence with the well-crafted majority opinion and to suggest that the dissent herein is predicated upon a fallacious premise and not supported by the Ohio Supreme Court's recent decision in *Bechtol v. Bechtol* (1990), 49 Ohio St. 3d 21.

While our dissenting brother may feel vindicated by the reversal of this court's decision in *Bechtol, supra,* his patriotism, palet for pastries, and preference of parents should not prevent his perception of the legal basis for the majority's decision.

The error in *Bechtol* was not our determination that the role of the primary caregiver is a relevant factor, but rather our finding that "the trial court did not *properly consider* this factor." *Bechtol, supra,* at 23. (Emphasis added.) Our ruling in the case at bar is not that the trial court failed to properly consider the child's age, but that the court completely ignored it in considering the primary caregiver factor. The relevance of a child's tender years or young age within the context of the primary caretaker factor is clearly recognized in *Bechtol, supra,* at 23, 24, wherein the Supreme Court expresses its belief that: "trial courts in considering and weighing the issue of who is the primary caregiver will give *due consideration* to the state of an *infant* child in a controversy concerning custody." (Emphasis added.)

I believe this is consistent with the majority opinion's expression that a child's tender years is a factor which warrants consideration in assessing the role of the primary caretaker and, ultimately, the child's best interest.

In the case at bar, there is nothing to suggest that the trial court gave any, let alone due, consideration to the child's age in its assessment of the primary caretaker role. Accordingly, the trial court erred by failing to consider the child's age in conjunction with its determination of the primary caregiver factor.

YOUNG, J., Dissenting:

I have observed, with increasing concern, a growing tendency of this court to reverse the judgment of a trial court for what I consider much less than an abuse of discretion. This tendency has been especially evident in the area of child custody matters. The Ohio Supreme Court has disapproved of this practice most recently in the case of *Bechtol v. Bechtol* (1990), 49 Ohio St. 3d 21, decided February 14, 1990. In that case, the supreme court unanimously reversed this court which had reversed a lower court ruling awarding custody to the father. The court held that where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the manifest weight of the evidence by a reviewing court. In my dissent in *Bechtol v. Bechtol* (Sept. 6, 1988), Clermont CA88-02-014, unreported, when it was before this same panel, I indicated that the majority was blatantly substituting its judgment for that of the trial judge. That is exactly what the majority is doing again in the case *sub judice.*

While I previously could not understand the reasoning behind such reversals by this court, it has now been given a name: "The Tender Years Doctrine."

R.C. 3109.04 sets forth the standards and factors to be considered in determining an award of custody. Nowhere is the tender years doctrine mentioned as a factor for consideration. In fact, the General Assembly has rejected the tender years doctrine and the determination of custody based upon the sex of the custodian.

I have always been under the impression that parties to an action started off on equal footing and were to receive equal consideration by the court. Now we are told by the majority that the parties are equal, but that the mother is a little more equal than the father because of her sex. I love the flag, apple pie and motherhood as much as anyone, but I fail to see a legal basis for the imposition of this doctrine in a custody proceeding. By its very nature it gives one party a preference in custody matters, a situation I'm sure the legislature never intended to exist.

The judgment of the trial court was not against the manifest weight of the evidence, did not constitute an abuse of discretion and should be affirmed.